# TILTON ET AL. *v.* RICHARDSON, SECRETARY OF HEALTH, EDUCATION, AND WELFARE, ET AL.

No. 153. Argued March 2–3, 1971—Decided June 28, 1971

BURGER, C. J., announced the Court's judgment and delivered an opinion in which HARLAN, STEWART, and BLACKMUN, JJ., joined. WHITE, J., filed an op iion concurring in the judgment, *ante,* p. 661. DOUGLAS, J., filed an opinion dissenting in part, in which BLACK and MARSHALL, JJ., joined, *post,* p. 689. BRENNAN, J., filed a dissenting opinion, *ante,* p. 642.

*Leo Pfeffer* argued the cause for appellants. With him on the briefs were *Peter L. Costas, Paul W. Orth,* and *Jerry Wagner.*

*Daniel M. Friedman* argued the cause for appellees Richardson et al. On the brief were *Solicitor General Griswold, Assistant Attorney General Ruckelshaus, Robert V. Zener,* and *Donald L. Horowitz. F. Michael Ahern,* Assistant Attorney General of Connecticut, argued the cause for appellee Peterson. With him on the brief was *Robert K. Killian,* Attorney General. *Edward Bennett Williams* argued the cause for appellee colleges and universities. With him on the brief were *Jeremiah C. Collins, Howard T. Owens, Lawrence W. Iannotti,* and *Bruce Lewellyn.*

Briefs of *amici curiae* urging reversal were filed by *Franklin C. Salisbury* for Protestants and Other Americans United for Separation of Church and State, and by *Peter L. Costas* and *Paul W. Orth* for the Connecticut State Conference of Branches of the NAACP et al.

Briefs of *amici curiae* urging affirmance were filed by *Wilber G. Katz* and *John Holt Myers* for the American Council on Education et al., and by *Nathan Lewin* for the National Jewish Commission on Law and Public Affairs.

MR. CHIEF JUSTICE BURGER announced the judgment of the Court and an opinion in which MR. JUSTICE HARLAN, MR. JUSTICE STEWART, and MR. JUSTICE BLACKMUN join.

This appeal presents important constitutional questions as to federal aid for church-related colleges and universities under Title I of the Higher Education Facilities Act of 1963, 77 Stat. 364, as amended, 20 U. S. C. §§ 711–721 (1964 ed. and Supp. V), which provides construction grants for buildings and facilities used

exclusively for secular educational purposes. We must determine first whether the Act authorizes aid to such church-related institutions, and, if so, whether the Act violates either the Establishment or Free Exercise Clauses of the First Amendment.

I

The Higher Education Facilities Act was passed in 1963 in response to a strong nationwide demand for the expansion of college and university facilities to meet the sharply rising number of young people demanding higher education. The Act authorizes federal grants and loans to "institutions of higher education" for the construction of a wide variety of "academic facilities." But § 751 (a)(2) (1964 ed., Supp. V) expressly excludes

> "any facility used or to be used for sectarian instruction or as a place for religious worship, or . . . any facility which . . . is used or to be used primarily in connection with any part of the program of a school or department of divinity . . . ."

The Act is administered by the United States Commissioner of Education. He advises colleges and universities applying for funds that under the Act no part of the project may be used for sectarian instruction, religious worship, or the programs of a divinity school. The Commissioner requires applicants to provide assurances that these restrictions will be respected. The United States retains a 20-year interest in any facility constructed with Title I funds. If, during this period, the recipient violates the statutory conditions, the United States is entitled to recover an amount equal to the proportion of its present value that the federal grant bore to the original cost of the facility. During the 20-year period, the statutory restrictions are enforced by the Office of Education primarily by way of on-site inspections.

Appellants are citizens and taxpayers of the United States and residents of Connecticut. They brought this suit for injunctive relief against the officials who administer the Act. Four church-related colleges and universities in Connecticut receiving federal construction grants under Title I were also named as defendants. Federal funds were used for five projects at these four institutions: (1) a library building at Sacred Heart University; (2) a music, drama, and arts building at Annhurst College; (3) a science building at Fairfield University; (4) a library building at Fairfield; and (5) a language laboratory at Albertus Magnus College.

A three-judge federal court was convened under 28 U. S. C. § 2282 and § 2284. Appellants attempted to show that the four recipient institutions were "sectarian" by introducing evidence of their relations with religious authorities, the content of their curricula, and other indicia of their religious character. The sponsorship of these institutions by religious organizations is not disputed. Appellee colleges introduced testimony that they had fully complied with the statutory conditions and that their religious affiliation in no way interfered with the performance of their secular educational functions. The District Court ruled that Title I authorized grants to church-related colleges and universities. It also sustained the constitutionality of the Act, finding that it had neither the purpose nor the effect of promoting religion. 312 F. Supp. 1191. We noted probable jurisdiction. 399 U. S. 904 (1970).

## II

We are satisfied that Congress intended the Act to include all colleges and universities regardless of any affiliation with or sponsorship by a religious body. Congress defined "institutions of higher education," which are eligible to receive aid under the Act, in broad and

inclusive terms. Certain institutions, for example, institutions that are neither public nor nonprofit, are expressly excluded, and the Act expressly prohibits use of the facilities for religious purposes. But the Act makes no reference to religious affiliation or nonaffiliation. Under these circumstances "institutions of higher education" must be taken to include church-related colleges and universities.

This interpretation is fully supported by the legislative history. Although there was extensive debate on the wisdom and constitutionality of aid to institutions affiliated with religious organizations, Congress clearly included them in the program. The sponsors of the Act so stated, 109 Cong. Rec. 19218 (1963) (remarks of Sen. Morse); *id.*, at 14954 (remarks of Rep. Powell); *id.*, at 14963 (remarks of Rep. Quie), and amendments aimed at the exclusion of church-related institutions were defeated. *Id.*, at 14990–14992, 19496.

## III

Numerous cases considered by the Court have noted the internal tension in the First Amendment between the Establishment Clause and the Free Exercise Clause. *Walz* v. *Tax Comm'n,* 397 U. S. 664 (1970), is the most recent decision seeking to define the boundaries of the neutral area between these two provisions within which the legislature may legitimately act. There, as in other decisions, the Court treated the three main concerns against which the Establishment Clause sought to protect: "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Id.,* at 668.

Every analysis must begin with the candid acknowledgment that there is no single constitutional caliper that can be used to measure the precise degree to which these three factors are present or absent. Instead, our

analysis in this area must begin with a consideration of the cumulative criteria developed over many years and applying to a wide range of governmental action challenged as violative of the Establishment Clause.

There are always risks in treating criteria discussed by the Court from time to time as "tests" in any limiting sense of that term. Constitutional adjudication does not lend itself to the absolutes of the physical sciences or mathematics. The standards should rather be viewed as guidelines with which to identify instances in which the objectives of the Religion Clauses have been impaired. And, as we have noted in *Lemon* v. *Kurtzman* and *Earley* v. *DiCenso, ante,* at 612, candor compels the acknowledgment that we can only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication.

Against this background we consider four questions: First, does the Act reflect a secular legislative purpose? Second, is the primary effect of the Act to advance or inhibit religion? Third, does the administration of the Act foster an excessive government entanglement with religion? Fourth, does the implementation of the Act inhibit the free exercise of religion?

(a)

The stated legislative purpose appears in the preamble where Congress found and declared that

> "the security and welfare of the United States require that this and future generations of American youth be assured ample opportunity for the fullest development of their intellectual capacities, and that this opportunity will be jeopardized unless the Nation's colleges and universities are encouraged and assisted in their efforts to accommodate rapidly growing numbers of youth who aspire to a higher education." 20 U. S. C. § 701.

This expresses a legitimate secular objective entirely appropriate for governmental action.

The simplistic argument that every form of financial aid to church-sponsored activity violates the Religion Clauses was rejected long ago in *Bradfield* v. *Roberts,* 175 U. S. 291 (1899). There a federal construction grant to a hospital operated by a religious order was upheld. Here the Act is challenged on the ground that its primary effect is to aid the religious purposes of church-related colleges and universities. Construction grants surely aid these institutions in the sense that the construction of buildings will assist them to perform their various functions. But bus transportation, textbooks, and tax exemptions all gave aid in the sense that religious bodies would otherwise have been forced to find other sources from which to finance these services. Yet all of these forms of governmental assistance have been upheld. *Everson* v. *Board of Education,* 330 U. S. 1 (1947); *Board of Education* v. *Allen,* 392 U. S. 236 (1968); *Walz* v. *Tax Comm'n, supra.* See also *Bradfield* v. *Roberts, supra.* The crucial question is not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion.

A possibility always exists, of course, that the legitimate objectives of any law or legislative program may be subverted by conscious design or lax enforcement. There is nothing new in this argument. But judicial concern about these possibilities cannot, standing alone, warrant striking down a statute as unconstitutional.

The Act itself was carefully drafted to ensure that the federally subsidized facilities would be devoted to the secular and not the religious function of the recipient institutions. It authorizes grants and loans only for academic facilities that will be used for defined secular purposes and expressly prohibits their use for religious

instruction, training, or worship. These restrictions have been enforced in the Act's actual administration, and the record shows that some church-related institutions have been required to disgorge benefits for failure to obey them.

Finally, this record fully supports the findings of the District Court that none of the four church-related institutions in this case has violated the statutory restrictions. The institutions presented evidence that there had been no religious services or worship in the federally financed facilities, that there are no religious symbols or plaques in or on them, and that they had been used solely for nonreligious purposes. On this record, therefore, these buildings are indistinguishable from a typical state university facility. Appellants presented no evidence to the contrary.

Appellants instead rely on the argument that government may not subsidize any activities of an institution of higher learning that in some of its programs teaches religious doctrines. This argument rests on *Everson* where the majority stated that the Establishment Clause barred any "tax . . . levied to support any religious . . . institutions . . . whatever form they may adopt to teach or practice religion." 330 U. S., at 16. In *Allen,* however, it was recognized that the Court had fashioned criteria under which an analysis of a statute's purpose and effect was determinative as to whether religion was being advanced by government action. 392 U. S., at 243; *Abington School District* v. *Schempp,* 374 U. S. 203, 222 (1963).

Under this concept appellants' position depends on the validity of the proposition that religion so permeates the secular education provided by church-related colleges and universities that their religious and secular educational functions are in fact inseparable. The argument that government grants would thus inevitably advance

religion did not escape the notice of Congress. It was carefully and thoughtfully debated, 109 Cong. Rec. 19474–19475, but was found unpersuasive. It was also considered by this Court in *Allen*. There the Court refused to assume that religiosity in parochial elementary and secondary schools necessarily permeates the secular education that they provide.

This record, similarly, provides no basis for any such assumption here. Two of the five federally financed buildings involved in this case are libraries. The District Court found that no classes had been conducted in either of these facilities and that no restrictions were imposed by the institutions on the books that they acquired. There is no evidence to the contrary. The third building was a language laboratory at Albertus Magnus College. The evidence showed that this facility was used solely to assist students with their pronunciation in modern foreign languages—a use which would seem peculiarly unrelated and unadaptable to religious indoctrination. Federal grants were also used to build a science building at Fairfield University and a music, drama, and arts building at Annhurst College.

There is no evidence that religion seeps into the use of any of these facilities. Indeed, the parties stipulated in the District Court that courses at these institutions are taught according to the academic requirements intrinsic to the subject matter and the individual teacher's concept of professional standards. Although appellants introduced several institutional documents that stated certain religious restrictions on what could be taught, other evidence showed that these restrictions were not in fact enforced and that the schools were characterized by an atmosphere of academic freedom rather than religious indoctrination. All four institutions, for example, subscribe to the 1940 Statement of Principles on Aca-

demic Freedom and Tenure endorsed by the American Association of University Professors and the Association of American Colleges.

Rather than focus on the four defendant colleges and universities involved in this case, however, appellants seek to shift our attention to a "composite profile" that they have constructed of the "typical sectarian" institution of higher education. We are told that such a "composite" institution imposes religious restrictions on admissions, requires attendance at religious activities, compels obedience to the doctrines and dogmas of the faith, requires instruction in theology and doctrine, and does everything it can to propagate a particular religion. Perhaps some church-related schools fit the pattern that appellants describe. Indeed, some colleges have been declared ineligible for aid by the authorities that administer the Act. But appellants do not contend that these four institutions fall within this category. Individual projects can be properly evaluated if and when challenges arise with respect to particular recipients and some evidence is then presented to show that the institution does in fact possess these characteristics. We cannot, however, strike down an Act of Congress on the basis of a hypothetical "profile."

(b)

Although we reject appellants' broad constitutional arguments we do perceive an aspect in which the statute's enforcement provisions are inadequate to ensure that the impact of the federal aid will not advance religion. If a recipient institution violates any of the statutory restrictions on the use of a federally financed facility, § 754 (b)(2) permits the Government to recover an amount equal to the proportion of the facility's present value that the federal grant bore to its original cost.

This remedy, however, is available to the Government only if the statutory conditions are violated "within twenty years after completion of construction." This 20-year period is termed by the statute as "the period of Federal interest" and reflects Congress' finding that after 20 years "the public benefit accruing to the United States" from the use of the federally financed facility "will equal or exceed in value" the amount of the federal grant. 20 U. S. C. § 754 (a).

Under § 754 (b)(2), therefore, a recipient institution's obligation not to use the facility for sectarian instruction or religious worship would appear to expire at the end of 20 years. We note, for example, that under § 718 (b)(7) (C) (1964 ed., Supp. V), an institution applying for a federal grant is only required to provide assurances that the facility will not be used for sectarian instruction or religious worship "during at least the period of the Federal interest therein (as defined in section 754 of this title)."

Limiting the prohibition for religious use of the structure to 20 years obviously opens the facility to use for any purpose at the end of that period. It cannot be assumed that a substantial structure has no value after that period and hence the unrestricted use of a valuable property is in effect a contribution of some value to a religious body. Congress did not base the 20-year provision on any contrary conclusion. If, at the end of 20 years, the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion.

To this extent the Act therefore trespasses on the Religion Clauses. The restrictive obligations of a recipient institution under § 751 (a)(2) cannot, compatibly with the Religion Clauses, expire while the building has substantial value. This circumstance does not require us to

invalidate the entire Act, however. "The cardinal principle of statutory construction is to save and not to destroy." *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 30 (1937). In *Champlin Rfg. Co.* v. *Commission*, 286 U. S. 210, 234 (1932), the Court noted

> "The unconstitutionality of a part of an Act does not necessarily defeat . . . the validity of its remaining provisions. Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law."

Nor does the absence of an express severability provision in the Act dictate the demise of the entire statute. *E. g., United States* v. *Jackson,* 390 U. S. 570, 585 n. 27 (1968).

We have found nothing in the statute or its objectives intimating that Congress considered the 20-year provision essential to the statutory program as a whole. In view of the broad and important goals that Congress intended this legislation to serve, there is no basis for assuming that the Act would have failed of passage without this provision; nor will its excision impair either the operation or administration of the Act in any significant respect.[1]

## IV

We next turn to the question of whether excessive entanglements characterize the relationship between government and church under the Act. *Walz* v. *Tax Comm'n, supra,* at 674–676. Our decision today in

---

[1] We note that the Commissioner of Education apparently includes no time limitation on the assurances that applicants are required to give with respect to the use of the facilities for sectarian instruction or religious worship. Compare § 3 (B)(3) with § 3 (C) of part P of the Application Form, App. 87.

*Lemon* v. *Kurtzman* and *Robinson* v. *DiCenso* has dis-
cussed and applied this independent measure of con-
stitutionality under the Religion Clauses. There we
concluded that excessive entanglements between govern-
ment and religion were fostered by Pennsylvania and
Rhode Island statutory programs under which state aid
was provided to parochial elementary and secondary
schools. Here, however, three factors substantially di-
minish the extent and the potential danger of the
entanglement.

In *DiCenso* the District Court found that the parochial
schools in Rhode Island were "an integral part of the
religious mission of the Catholic Church." There, the
record fully supported the conclusion that the inculca-
tion of religious values was a substantial if not the
dominant purpose of the institutions. The Pennsyl-
vania case was decided on the pleadings, and hence we
accepted as true the allegations that the parochial schools
in that State shared the same characteris'ics.

Appellants' complaint here contains similar allegations.
But they were denied by the answers, and there was
extensive evidence introduced on the subject. Although
the District Court made no findings with respect to the
religious character of the four institutions of higher learn-
ing, we are not required to accept the allegations as true
under these circumstances, particularly where, as here,
appellants themselves do not contend that these four
institutions are "sectarian."

There are generally significant differences between the
religious aspects of church-related institutions of higher
learning and parochial elementary and secondary schools.[2]
The "affirmative if not dominant policy" of the instruc-
tion in pre-college church schools is "to assure future

---

[2] See Freund, Comment, Public Aid to Parochial Schools, 82 Harv.
L. Rev. 1680, 1691 (1969).

adherents to a particular faith by having control of their total education at an early age." *Walz* v. *Tax Comm'n, supra,* at 671.[3]  There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination.[4]  Common observation would seem to support that view, and Congress may well have entertained it.  The skepticism of the college student is not an inconsiderable barrier to any attempt or tendency to subvert the congressional objectives and limitations.  Furthermore, by their very nature, college and postgraduate courses tend to limit the opportunities for sectarian influence by virtue of their own internal disciplines.  Many church-related colleges and universities are characterized by a high degree of academic freedom [5] and seek to evoke free and critical responses from their students.

The record here would not support a conclusion that any of these four institutions departed from this general pattern.  All four schools are governed by Catholic religious organizations, and the faculties and student bodies at each are predominantly Catholic.  Nevertheless, the evidence shows that non-Catholics were admitted as students and given faculty appointments.  Not one of these four institutions requires its students to attend religious services.  Although all four schools require their students to take theology courses, the parties stipulated that these courses are taught according to the academic requirements of the subject matter and the teacher's concept of professional standards.  The parties also stipulated that the courses covered a range of human religious

---

[3] *E. g.,* J. Fichter, Parochial School: A Sociological Study. 77–108 (1958); Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development, pt. II, The Nonestablishment Principle, 81 Harv. L. Rev. 513, 574 (1968).

[4] Giannella, *supra,* n. 3, at 583.

[5] M. Pattillo & D. Mackenzie, Church-Sponsored Higher Education in the United States 96, 167, 204 (1966).

experiences and are not limited to courses about the Roman Catholic religion. The schools introduced evidence that they made no attempt to indoctrinate students or to proselytize. Indeed, some of the required theology courses at Albertus Magnus and Sacred Heart are taught by rabbis. Finally, as we have noted, these four schools subscribe to a well-established set of principles of academic freedom, and nothing in this record shows that these principles are not in fact followed. In short, the evidence shows institutions with admittedly religious functions but whose predominant higher education mission is to provide their students with a secular education.

Since religious indoctrination is not a substantial purpose or activity of these church-related colleges and universities, there is less likelihood than in primary and secondary schools that religion will permeate the area of secular education. This reduces the risk that government aid will in fact serve to support religious activities. Correspondingly, the necessity for intensive government surveillance is diminished and the resulting entanglements between government and religion lessened. Such inspection as may be necessary to ascertain that the facilities are devoted to secular education is minimal and indeed hardly more than the inspections that States impose over all private schools within the reach of compulsory education laws.

The entanglement between church and state is also lessened here by the nonideological character of the aid that the Government provides. Our cases from *Everson* to *Allen* have permitted church-related schools to receive government aid in the form of secular, neutral, or nonideological services, facilities, or materials that are supplied to all students regardless of the affiliation of the school that they attend. In *Lemon* and *DiCenso*, however, the state programs subsidized teachers, either directly or indirectly. Since teachers are not necessarily

religiously neutral, greater governmental surveillance would be required to guarantee that state salary aid would not in fact subsidize religious instruction. There we found the resulting entanglement excessive. Here, on the other hand, the Government provides facilities that are themselves religiously neutral. The risks of Government aid to religion and the corresponding need for surveillance are therefore reduced.

Finally, government entanglements with religion are reduced by the circumstance that, unlike the direct and continuing payments under the Pennsylvania program, and all the incidents of regulation and surveillance, the Government aid here is a one-time, single-purpose construction grant. There are no continuing financial relationships or dependencies, no annual audits, and no government analysis of an institution's expenditures on secular as distinguished from religious activities. Inspection as to use is a minimal contact.

No one of these three factors standing alone is necessarily controlling; cumulatively all of them shape a narrow and limited relationship with government which involves fewer and less significant contacts than the two state schemes before us in *Lemon* and *DiCenso*. The relationship therefore has less potential for realizing the substantive evils against which the Religion Clauses were intended to protect.

We think that cumulatively these three factors also substantially lessen the potential for divisive religious fragmentation in the political arena. This conclusion is admittedly difficult to document, but neither have appellants pointed to any continuing religious aggravation on this matter in the political processes. Possibly this can be explained by the character and diversity of the recipient colleges and universities and the absence of any intimate continuing relationship or dependency between government and religiously affiliated institutions. The

potential for divisiveness inherent in the essentially local problems of primary and secondary schools is significantly less with respect to a college or university whose student constituency is not local but diverse and widely dispersed.

## V

Finally, we must consider whether the implementation of the Act inhibits the free exercise of religion in violation of the First Amendment. Appellants claim that the Free Exercise Clause is violated because they are compelled to pay taxes, the proceeds of which in part finance grants under the Act. Appellants, however, are unable to identify any coercion directed at the practice or exercise of their religious beliefs. *Board of Education* v. *Allen, supra,* at 248–249. Their share of the cost of the grants under the Act is not fundamentally distinguishable from the impact of the tax exemption sustained in *Walz* or the provision of textbooks upheld in *Allen.*

We conclude that the Act does not violate the Religion Clauses of the First Amendment except that part of §754 (b)(2) providing a 20-year limitation on the religious use restrictions contained in §751 (a)(2). We remand to the District Court with directions to enter a judgment consistent with this opinion.

*Vacated and remanded.*

[For separate opinion of MR. JUSTICE BRENNAN, see *ante,* p. 642.]

[For opinion of MR. JUSTICE WHITE, concurring in the judgment, see *ante,* p. 661.]

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK and MR. JUSTICE MARSHALL concur, dissenting in part.

The correct constitutional principle for this case was stated by President Kennedy in 1961 when questioned as

to his policy respecting aid to private and parochial schools:[1]

> "[T]he Constitution clearly prohibits aid to the school, to parochial schools. I don't think there is any doubt of that.
>
> "The Everson case, which is probably the most celebrated case, provided only by a 5 to 4 decision was it possible for a local community to provide bus rides to nonpublic school children. But all through the majority and minority statements on that particular question there was a very clear prohibition against aid to the school direct. The Supreme Court made its decision in the Everson case by determining that the aid was to the child, not to the school. Aid to the school is—there isn't any room for debate on that subject. It is prohibited by the Constitution, and the Supreme Court has made that very clear. And therefore there would be no possibility of our recommending it."

Taxpayer appellants brought this suit challenging the validity of certain expenditures, made by the Department of Health, Education, and Welfare, for the construction of (1) a library at Sacred Heart University, (2) a music, drama, and arts building at Annhurst College, (3) a library and a science building at Fairfield University, and (4) a laboratory at Albertus Magnus College. The complaint alleged that all of these institutions were controlled by religious orders and the Roman Catholic Diocese of Bridgeport, Conn., and that if the funds for construction were authorized by Title I of the Higher Education Facilities Act of 1963, 77 Stat. 364, as amended, 20 U. S. C. §§ 711–721 (1964 ed. and Supp. V), then that statute was unconstitutional because it violated the

---

[1] Public Papers of the Presidents of the United States, John F. Kennedy, 1961, pp. 142–143, News Conference March 1, 1961.

Establishment Clause. A three-judge District Court was convened and rejected appellants' claims.

Title I of the Higher Education Facilities Act of 1963 authorizes grants and loans up to 50% of the cost for the construction of undergraduate academic facilities in both public and private colleges and universities. A project is eligible if construction will result "in an urgently needed substantial expansion of the institution's student enrollment capacity, capacity to provide needed health care to students or personnel of the institution, or capacity to carry out extension and continuing education programs on the campus of such institution." 20 U. S. C. § 716 (1964 ed., Supp. V). The Commissioner of Education is authorized to prescribe basic criteria and is instructed to "give special consideration to expansion of undergraduate enrollment capacity." 20 U. S. C. § 717 (1964 ed., Supp. V).

Academic facilities are "structures suitable for use as classrooms, laboratories, libraries, and related facilities necessary or appropriate for instruction of students, or for research . . . programs." Specifically excluded are facilities "used or to be used for sectarian instruction or as a place for religious worship" or any facilities used "primarily in connection with any part of the program of a school or department of divinity." 20 U. S. C. § 751 (a) (1964 ed., Supp. V). The United States retains a 20-year interest in the facilities and should a facility be used other than as an academic facility then the United States is entitled to recover an amount equal to the proportion of present value which the federal grant bore to the original cost of the facility. 20 U. S. C. § 754 (b). According to a stipulation entered below, during the 20 years the Office of Education attempts to insure that facilities are used in the manner required by the Act primarily by on-site inspections. At the end of the 20-year period the federal interest in the facility ceases and

the college may use it as it pleases. See 20 U. S. C. § 754 (a).

The public purpose in secular education is, to be sure, furthered by the program. Yet the sectarian purpose is aided by making the parochial school system viable. The purpose is to increase "student enrollment" and the students obviously aimed at are those of the particular faith now financed by taxpayers' money. Parochial schools are not beamed at agnostics, atheists, or those of a competing sect. The more sophisticated institutions may admit minorities; but the dominant religious character is not changed.

The reversion of the facility to the parochial school[2] at the end of 20 years is an outright grant, measurable by the present discounted worth of the facility. A gift of taxpayers' funds in that amount would plainly be unconstitutional. The Court properly bars it even though disguised in the form of a reversionary interest. See *Lane* v. *Wilson,* 307 U. S. 268, 275.

But the invalidation of this one clause cannot cure the constitutional infirmities of the statute as a whole. The Federal Government is giving religious schools a block grant to build certain facilities. The fact that money is

---

[2] "It should be clear to all that a Roman Catholic parochial school is an integral part of that church, as definitely so as is the service of worship. A parochial school is usually developed in connection with a church. In many cases the church and school monies are not even separated. Such a school is in no sense a public school, even though some children from other groups may be admitted to it. The buildings are not owned and controlled by a community of American people, not even by a community of American Roman Catholic *people*. The title of ownership in a public school is vested in the local community, in the elected officers of the school board or the city council. But the title of ownership in a parochial school is vested in the bishop as an individual, who is appointed by, who is under the direct control of, and who reports to the pope in Rome." L. Boettner, Roman Catholicism 375 (1962).

given once at the beginning of a program rather than apportioned annually as in *Lemon* and *DiCenso* is without constitutional significance. The First Amendment bars establishment of a religion. And as I noted today in *Lemon* and *DiCenso*, this bar has been consistently interpreted from *Everson* v. *Board of Education,* 330 U. S. 1, 16, through *Torcaso* v. *Watkins,* 367 U. S. 488, 493 as meaning: "No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." Thus it is hardly impressive that rather than giving a smaller amount of money annually over a long period of years, Congress instead gives a large amount all at once. The plurality's distinction is in effect that small violations of the First Amendment over a period of years are unconstitutional (see *Lemon* and *DiCenso*) while a huge violation occurring only once is *de minimis.* I cannot agree with such sophistry.

What I have said in *Lemon* and in the *DiCenso* cases decided today is relevant here. The facilities financed by taxpayers' funds are not to be used for "sectarian" purposes. Religious teaching and secular teaching are so enmeshed in parochial schools that only the strictest supervision and surveillance would insure compliance with the condition. Parochial schools may require religious exercises, even in the classroom. A parochial school operates on one budget. Money not spent for one purpose becomes available for other purposes. Thus the fact that there are no religious observances in federally financed facilities is not controlling because required religious observances will take place in other buildings. Our decision in *Engel* v. *Vitale,* 370 U. S. 421, held that a requirement of a prayer in public schools violated the Establishment Clause. Once these schools become federally funded they become bound by federal standards

(*Ivanhoe Irrig. Dist.* v. *McCracken,* 357 U. S. 275, 296; *Rosado* v. *Wyman,* 397 U. S. 397, 427 (concurring opinion); *Simkins* v. *Moses H. Cone Memorial Hosp.,* 323 F. 2d 959) and accordingly adherence to *Engel* would require an end to required religious exercises. That kind of surveillance and control will certainly be obnoxious to the church authorities and if done will radically change the character of the parochial school. Yet if that surveillance is not searching and continuous, this federal financing is obnoxious under the Establishment and Free Exercise Clauses for the reasons stated in the companion cases.

In other words, surveillance creates an entanglement of government and religion which the First Amendment was designed to avoid. Yet after today's decision there will be a requirement of surveillance which will last for the useful life of the building and as we have previously noted, "[it] is hardly lack of due process for the Government to regulate that which it subsidizes." *Wickard* v. *Filburn,* 317 U. S. 111, 131. The price of the subsidy under the Act is violation of the Free Exercise Clause. Could a course in the History of Methodism be taught in a federally financed building? Would a religiously slanted version of the Reformation or Quebec politics under Duplessis be permissible? How can the Government know what is taught in the federally financed building without a continuous auditing of classroom instruction? Yet both the Free Exercise Clause and academic freedom are violated when the Government agent must be present to determine whether the course content is satisfactory.

As I said in the *Lemon* and *DiCenso* cases, a parochial school is a unitary institution with subtle blending of sectarian and secular instruction. Thus the practices of religious schools are in no way affected by the minimal requirement that the government financed facility may

not "be used for sectarian instruction or as a place for religious worship." Money saved from one item in the budget is free to be used elsewhere. By conducting religious services in another building, the school has—rent free—a building for nonsectarian use. This is not called Establishment simply because the government retains a continuing interest in the building for its useful life, even though the religious schools need never pay a cent for the use of the building.

Much is made of the need for public aid to church schools in light of their pressing fiscal problems. Dr. Eugene C. Blake of the Presbyterian Church, however, wrote in 1959: [3]

> "When one remembers that churches pay no inheritance tax (churches do not die), that churches may own and operate business and be exempt from the 52 percent corporate income tax, and that real property used for church purposes (which in some states are most generously construed) is tax exempt, it is not unreasonable to prophesy that with reasonably prudent management, the churches ought to be able to control the whole economy of the nation within the predictable future. That the growing wealth and property of the churches was partially responsible for revolutionary expropriations of church property in England in the sixteenth century, in France in the eighteenth century, in Italy in the nineteenth century, and in Mexico, Russia, Czechoslovakia and Hungary (to name a few examples) in the twentieth century, seems self-evident. A government with mounting tax problems cannot be expected to keep its hands off the wealth of a rich church forever. That such a revolution is always

---

[3] Tax Exemption and the Churches, 3 Christianity Today, No. 22, Aug. 3, 1959, pp. 6, 7.

accompanied by anticlericalism and atheism should not be surprising."

The mounting wealth of the churches [4] makes ironic their incessant demands on the public treasury. I said in my dissent in *Walz* v. *Tax Comm'n,* 397 U. S. 664, 714:

"The religiously used real estate of the churches today constitutes a vast domain. See M. Larson & C. Lowell, The Churches: Their Riches, Revenues, and Immunities (1969). Their assets total over $141 billion and their annual income at least $22 billion. *Id.;* at 232. And the extent to which they are feeding from the public trough in a variety of forms is alarming. *Id.,* c. 10."

See A. Balk, The Religion Business (1968); 20 Church and State 8 (1967).

It is almost unbelievable that we have made the radical departure from Madison's Remonstrance [5] memorialized in today's decision.

---

[4] Churches that owned an unrelated business enjoyed until recently a special tax advantage. Other charitable organizations were taxed on their "unrelated business taxable income" derived from businesses regularly carried on by them. § 512 of the Internal Revenue Code of 1954. That tax was the normal tax and surtax. Thus in the case of income derived from corporations it was 22% on the first $25,000 and 48% on any additional income. § 11. Churches were exempted from this "unrelated business income" tax. § 511 (a)(2). Thus they paid no federal taxes on any of their revenues. Under the Tax Reform Act of 1969, 83 Stat. 487, the tax advantage for unrelated business income as respects all businesses owned by churches (prior to May 27, 1969) will be terminated after January 1, 1976. § 121 (b)(2), 83 Stat. 540, 26 U. S. C. § 512 (b)(16) (1964 ed., Supp. V). See H. R. Rep. No. 91–413 (pt. I), pp. 46–47, 48; H. R. Conf. Rep. No. 91–782, p. 67.

[5] The Remonstrance is reproduced in appendices to the dissenting opinion of Rutledge, J., in *Everson,* 330 U. S., at 63, and to that of DOUGLAS, J., in *Walz* v. *Tax Comm'n,* 397 U. S., at 719.

I dissent not because of any lack of respect for parochial schools but out of a feeling of despair that the respect which through history has been accorded the First Amendment is this day lost.

It should be remembered that in this case we deal with federal grants and with the command that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The million-dollar grants sustained today put Madison's miserable "three pence" to shame. But he even thought, as I do, that even a small amount coming out of the pocket of taxpayers and going into the coffers of a church was not in keeping with our constitutional ideal.

I would reverse the judgment below.