Bristol C. **MYERS**, Appellant–Defendant,

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 64A03–9808–CR–349.

Court of Appeals of Indiana.

July 22, 1999.

Transfer Denied Sept. 21, 1999.

Division of Mental Health is not financially responsible. *In re Commitment of A.N.B.* (1993) Ind.App., 614 N.E.2d 563, 566.

Larry W. Rogers, Harper & Rogers, Valparaiso, Indiana, Attorney for Appellant.

William H. Wagner, Mark E. Schmidtke, Kevin G. Kerr, Hoeppner, Wagner & Evans, Valparaiso, Indiana, Amicus Curiae, Attorneys for Valparaiso University.

Henry C. Ryder, Barnes & Thornburg, Indianapolis, Indiana, Amicus Curiae, Counsel for Hanover College.

Ken Elmendorf, Elmendorf & Meyer, Brownsburg, Indiana, Amicus Curiae, Counsel for Marian College.

Jeffrey A. Modisett, Attorney General of Indiana, A. Scott Chinn, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

RUCKER, Judge

While driving his car near the campus of Valparaiso University, Bristol C. Myers was arrested by a University police officer and thereafter charged with operating a vehicle while intoxicated as a Class A misdemeanor[1]

---

1. Ind.Code § 9–30–5–2.

and operating a vehicle with a blood alcohol content greater than .10% as a Class C misdemeanor.[2] After a bench trial Myers was found guilty of the Class A misdemeanor. He now appeals raising three issues for our review which we rephrase as follows: 1) does Ind.Code § 20–12–3.5–1 *et seq.*, which permits the creation of university police forces, violate the First Amendment to the United States Constitution; 2) are university police officers required to complete training conducted by the Indiana Law Enforcement Academy; and 3) did the officer lack reasonable suspicion to initiate a traffic stop? We conclude the statute is not unconstitutional; university police officers are not required to complete training conducted by the Indiana Law Enforcement Academy; and the officer in this case had reasonable suspicion to initiate a traffic stop.

We therefore affirm.

The following facts pertinent to this appeal are not disputed by the parties. Valparaiso University is an institution of higher learning affiliated with the Lutheran Church Missouri Synod. It describes itself as a "church-related university" dedicated to the exploration of the "cultural and religious heritage of mankind." R. at 66 (quoting VALPARAISO UNIVERSITY, 1997–1998 GENERAL CATALOG 5). Valparaiso University is under neither the control nor the authority of any church body, but is an independent institution owned and operated by the Lutheran University Association, a non-profit Indiana corporation. The University receives no direct support from any church body and is accredited by the North Central Association ("NCA"). Valparaiso University operates a university police department whose officers are appointed by the governing board of the University pursuant to Ind.Code § 20–12–3.5–1.

Myers is a law student at Valparaiso University. In the early morning hours of October 4, 1996, he exited the parking lot of a friend's home located across the street from the law school. At the same time, Officer Jason Ezell of the Valparaiso University Police Department was patrolling the streets on and near the University campus. Officer Ezell observed Myers driving his pick-up truck left of center on a two lane street on campus. The officer followed Myers for ap-proximately one block and observed him make a slow left-hand turn into the oncoming lane of traffic of a main east/west street also on campus. According to the officer the truck was driving so slowly that he "thought the vehicle was going to come to a stop and park against traffic but it continued on." R. at 115. Myers then continued westbound where he turned left onto another street. By this time Myers was apparently off campus. In any event as he made the turn, the passenger door of his truck swung open appearing to strike a parked vehicle. The officer followed Myers for a short distance and then activated his overhead lights to initiate a traffic stop. When Myers exited his truck, Officer Ezell observed that his eyes were glassy and bloodshot, and he had an odor of alcohol on his breath. When asked if he had consumed any alcoholic beverages that night, Myers responded affirmatively. In addition to failing a "walk and turn" field sobriety test, Myers scored .16% on a chemical breath test. Myers was ultimately arrested and charged with operating a vehicle while intoxicated and operating a vehicle with a blood alcohol content greater than .10%. He was also given a traffic citation for driving left of center and for an "equipment violation" related to the door of his truck swinging open. Myers filed a pretrial motion to suppress the evidence based on three grounds: 1) the exercise of police power by a private religious institution is unconstitutional; 2) the arresting officer, an employee of a religious institution, had not undergone the training statutorily required of officers employed by the State and therefore lacked authority to make an arrest; and 3) the officer lacked both reasonable suspicion to stop Myers and probable cause to arrest him. The motion was denied. After a bench trial Myers was convicted of driving while intoxicated as a Class A misdemeanor. This appeal followed.

I.

Over Myers' objection the trial court admitted evidence of the chemical breath test as well as testimony concerning other indicia of Myers' intoxication. In his first challenge

---

2. Ind.Code § 9–30–5–1.

to the trial court's ruling Myers contends the trial court erred in admitting any evidence seized as a result of his arrest because the statutory authority under which the arresting officer purportedly acted is unconstitutional. The statute in question is Ind.Code § 20–12–3.5–1 which provides:

> The Ball State University board of trustees, Indiana State University board of trustees, the trustees of Indiana University, the trustees of Purdue University, University of Southern Indiana board of trustees, the board of trustees of Vincennes University, *and the governing board of any other college, university or junior college that is accredited by the North Central Association* is authorized:
>
> 1) To appoint police officers for the institution for which it is responsible;
>
> 2) To prescribe their duties and direct their conduct;
>
> 3) To prescribe the distinctive uniforms for the police of the institution or campus; and
>
> 4) To designate and operate emergency vehicles.

(Emphasis added). According to Myers, "this is a case where a statute vests governmental power in the hands of a private institution dominated and controlled by religion." Brief of Appellant at 10 (emphasis omitted).

■ We begin our analysis with well settled principles. Statutes are presumed to be constitutional and such presumption continues until clearly overcome by a showing to the contrary. *Finney v. State*, 491 N.E.2d 1029, 1031 (Ind.Ct.App.1986); *Lewis v. State*, 484 N.E.2d 77, 79 (Ind.Ct.App.1985). All doubts are resolved in favor of a statute's constitutionality. *Regan v. State*, 590 N.E.2d 640, 645 (Ind.Ct.App.1992). The burden is on the party challenging a statute to demonstrate its unconstitutionality. *Finney*, 491 N.E.2d at 1031.

■ The First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment Due Process Clause, provides "Congress shall make no law respecting an establishment of religion, nor prohibiting the free exercise thereof." U.S. Const. Amend. 1. At issue in this case is the free exercise clause. The Supreme Court has "repeatedly emphasized [its] unwillingness to be confined to any single test or criterion" when scrutinizing challenged legislation or official conduct to determine whether it violates the First Amendment. *Lynch v. Donnelly*, 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984) (citing *Tilton v. Richardson*, 403 U.S. 672, 677–78, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790 (1971); *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 773 n. 31, 93 S.Ct. 2955, 2965 n. 31, 37 L.Ed.2d 948 (1973)). Indeed the Court has engaged in a robust debate concerning Establishment Clause jurisprudence. Nonetheless the Court has consistently used a three-pronged analytical scheme articulated in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) as a guide in detecting unconstitutional government action. *See, e.g., Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 385 n. 7, 113 S.Ct. 2141, 2148 n. 7, 124 L.Ed.2d 352 (1993) (writing for the majority Justice White noted that "there is a proper way to inter an established decision, and *Lemon* however frightening it might be to some, has not been overruled.") The analytical scheme, known as the "*Lemon* test," is stated as follows: "[f]irst, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" *Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111 [3] (citations omitted). We apply the

---

**3.** The heart of the "robust debate" noted *infra*, involves the entanglement prong of the "*Lemon* test." It has been criticized as being "blurred, indistinct, and variable" as well as "insolubly paradoxical." *See Roemer v. Md. Pub. Works Bd.*, 426 U.S. 736, 768–69, 96 S.Ct. 2337, 2355, 49 L.Ed.2d 179 (1976) (White, J., concurring, joined by Rehnquist, C.J.). "The required inquiry into

'entanglement' has been modified and questioned[,]" and the entire *Lemon* test has been said to have "proved problematic." *Wallace v. Jaffree*, 472 U.S. 38, 68, 105 S.Ct. 2479, 2496, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring). In *Lee v. Weisman*, the Supreme Court did not rely on the *Lemon* test at all, prompting Justice Scalia to comment "[t]he Court today demon-

test here as a guide in evaluating the constitutionality of Ind.Code § 20–12–3.5–1.

■ Myers does not contend that the statute has anything other than a secular or legislative purpose. Indeed our own review of the statute reveals nothing that indicates an intent on the part of the legislature to either aid, promote, restrict, hinder, or otherwise affect religion or any religious organization. On its face the statute is neutral and applies to any post-secondary educational institution, public or private, that is accredited by the North Central Association.[4] The ability of a post-secondary educational institution to create a police force is not dependent upon its status as a secular or sectarian institution. We view the purpose of the statute here as merely extending to NCA accredited institutions of higher learning the police power of the State in order to protect persons and property located on or near their premises. This is clearly a secular legislative purpose.

■ Next we must determine whether the principal or primary effect of Ind.Code § 20–12–3.5–1 is to advance or inhibit religion. The Establishment Clause is violated if a State enacts laws which "aid one religion, aid all religions, or prefer one religion over another." *County of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 591, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989) (quoting *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15, 67 S.Ct. 504, 511–12, 91 L.Ed. 711 (1947)). However, legislation that provides some incidental or remote advantage to a religious organization does not run afoul of the Establishment Clause. *Bowen v. Kendrick*, 487 U.S. 589, 609, 108 S.Ct. 2562, 2574, 101 L.Ed.2d 520 (1988). We note from the outset our disagreement with Myers' unequivocal statement that Valparaiso University is a "religious institution" within the meaning of the Establishment Clause. Brief of Appel-

lant at 111–12. We explore this issue in greater detail below under the third prong of the *Lemon* test. At this juncture, suffice it to say that the primary effect of Ind.Code § 20–12–3.5–1 neither advances nor inhibits religion. As previously noted the statute makes no distinction between religious and secular institutions. It applies to all educational institutions of higher learning, whether public or private, provided they are accredited by the NCA. Further, the primary benefits which flow from a grant of authority for an NCA accredited institution to form a police force are strictly secular in nature. Public and private institutions are benefitted by having increased authority to protect persons and property located on their premises, and the State is benefitted by the increased law enforcement which is provided without expense to the State. The State certainly has an interest in the enforcement of its laws and in the protection of its citizens and their property.

■ Finally we must determine whether Ind.Code § 20–12–3.5–1 fosters an excessive government entanglement with religion. Citing *Larkin v. Grendel's Den Inc.*, 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), Myers argues that the delegation of governmental powers to a religious institution violates the Establishment Clause. 459 U.S. at 127, 103 S.Ct. at 512 (commenting that "[t]he Framers did not set up a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions"). Although *Larkin* is instructive, it is not dispositive because it is distinguishable from the case before us. In *Larkin* a Massachusetts statute vested in the governing body of schools and churches the power to prevent issuance of liquor licenses for premises located within a 500–foot radius of the church or school by objecting to the license application.

strates the irrelevance of *Lemon* by essentially ignoring it, and the interment of that case may be the one happy by product of the Court's otherwise lamentable decision." 505 U.S. 577, 644, 112 S.Ct. 2649, 2685, 120 L.Ed.2d 467 (1992) (Scalia, J., dissenting) (citations omitted).

4. The North Central Association of Colleges and Secondary Schools, a voluntary association of colleges and secondary schools, was founded in

1895. Its stated purpose is to assist in "the development and maintenance of high standards of excellence for universities, colleges, and secondary schools, the continued improvement of the educational program and the effectiveness of instruction on secondary and college levels." *Parsons College v. North Central Assoc. of Colleges and Secondary Schools*, 271 F.Supp. 65, 66 (N.D.Ill.1967).

Appellee Larkin, a restaurant owner, applied for a liquor license that was denied because a church, located within 10 feet of the restaurant, objected. The restaurant owner filed suit contending, among other things, the statute on its face and as applied violated the Establishment Clause of the First Amendment. The trial court agreed and upon appeal the Supreme Court affirmed the trial court's judgment. In so doing the Court included in its analysis the three-pronged test articulated in *Lemon.* As for the third prong the Court noted:

> Turning to the third phase of the inquiry called for by *Lemon v. Kurtzman,* we see that we have not previously had occasion to consider the entanglement implications of a statute vesting significant governmental authority in churches. *This statute enmeshes churches in the exercise of substantial governmental powers* contrary to our consistent interpretation of the Establishment Clause; '[t]he objective is to prevent, as far as possible, the intrusion of either [Church or State] into the precincts of the other.'
>
> . . . .
>
> *[This statute] substitutes the unilateral and absolute power of a church for the reasoned decision making of a public legislative body acting on evidence and guided by standards,* on issues with significant economic and political implications. The challenged statute thus enmeshes churches in the process of government and creates the danger of '[p]olitical fragmentation and divisiveness on religious lines.'

*Larkin,* 459 U.S. at 126–127, 103 S.Ct. at 512 (citations omitted) (emphasis added).

■ Unlike the Massachusetts statute in *Larkin* the statute here does not "substitute[ ] the unilateral and absolute power of a church for the reasoned decision making of a public legislative body." *Id.* First, Valparaiso University is not a church. However, assuming that *Larkin* applies to a religious institution whether or not it is a church, the record shows that although Valparaiso University is religiously affiliated, it is not a religious institution within the meaning of the First Amendment. Rather it is an institution of higher education affiliated with the

Lutheran Church Missouri Synod. The Supreme Court has long recognized that in order to be characterized as a religious institution for First Amendment purposes, the religious character of the institution must be "so pervasive that a substantial portion of its functions are subsumed in the religious mission." *Hunt v. McNair,* 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973). Even "[f]ormal denominational control over a liberal arts college does not render all aid to the institution a violation of the Establishment Clause." *Hunt,* 413 U.S. at 746 n. 8, 93 S.Ct. at 2876 n. 8.

In *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), the Supreme Court described the general pattern of education at religiously affiliated colleges and universities. The Court observed: "by their very nature, college and postgraduate courses tend to limit the opportunities for sectarian influences by virtue of their own internal disciplines. Many church-related colleges and universities are characterized by a high degree of academic freedom and seek to evoke free and critical responses from their students." *Tilton,* 403 U.S. at 686, 91 S.Ct. at 2099. The court proceeded to note that four universities receiving aid were "governed by Catholic religious organizations" and populated by predominately Catholic faculties and student bodies. *Tilton,* 403 U.S. at 686–87, 91 S.Ct. at 2099–2100. However, all four schools admitted and employed non-Catholics, and none mandated student attendance at religious services. Theology courses, though required, were not limited to consideration of Roman Catholicism and were taught according to the professors' professional standards and "the academic requirements of the subject matter." *Tilton,* 403 U.S. at 686–87, 91 S.Ct. at 2100. Thus the Court concluded that all four universities were "institutions with admittedly religious functions but whose predominant higher education mission is to provide their students with a secular education." *Tilton,* 403 U.S. at 687, 91 S.Ct. at 2100.

■ In the case before us Valparaiso University is not governed by Lutheran religious organizations, nor is it populated by a predominately Lutheran faculty and student

body. Rather the record shows that Valparaiso University has a faculty of instructors who adhere to various faiths, only 38% of whom are Lutheran. Its student body is comprised of 34% Lutherans, 25% Catholics, and the remainder of various other faiths. Although students are required to complete nine hours of theology, religious courses dealing with the Lutheran faith and a variety of other faiths may be taken to fulfill this requirement. Thus, although closely affiliated with a religious denomination, Valparaiso University does not subordinate secular education to religious doctrine. It functions neither as a church nor as a religious governing body. It is clear to this court that the religious character of Valparaiso University is not "so pervasive that a substantial portion of its functions are subsumed in the religious mission." *Hunt*, 413 U.S. at 743, 93 S.Ct. at 2874. Accordingly we have no hesitancy concluding that Valparaiso University is not a religious institution for First Amendment purposes. The mandate of *Larkin* prohibiting a legislative body from substituting its reasoned decision making for the unilateral and absolute power of "a church" is not applicable here.

■ Second, the challenged statute in *Larkin* conferred upon a religious institution the power to veto applications for liquor licenses. The religious institution thus effectively usurped the role of the State. Such abdication by the State excessively entangled church and state. *Larkin*, 459 U.S. at 127, 103 S.Ct. at 512. Religious authority completely supplanted civic authority, allowing churches to use civic authority for purely religious ends. By contrast the delegation of power in this case did not substitute the opinion of a religious body for that of the state and therefore did not fuse religious and governmental functions. "Where 'fusion' is an issue [as in Larkin], the difference lies in the distinction between a government's purposeful delegation on the basis of religion and a delegation on principles neutral to religion, to individuals whose religious identities are incidental to their receipt of civic

authority." *Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 699, 114 S.Ct. 2481, 2489, 129 L.Ed.2d 546 (1994). Neither abdication of state power to a religious institution nor the resulting fusion of governmental and religious functions occurred here. The police power exercised by Valparaiso University police officers serves not as a standardless vehicle for the advancement or protection of religious interest but as a neutral means of protecting the safety of all citizens and residents at or near the university. We conclude that the objectives of the Establishment Clause of the First Amendment were not impaired by the operation of Ind.Code § 20–12–3.5–1 because the statute did not create an excessive entanglement between Church and State. The standard established by *Larkin* clearly prohibits states from allowing churches to exercise civic authority without appropriate standards and with the goal of protecting religious interests. The delegation in the case before us was neither to a church nor a religious governing body, did not involve the exercise of civic power without standards, and did not have the purpose or effect of protecting or promoting religious interests. It thus did not run afoul of the Establishment Clause of the First Amendment.[5]

II.

■ Myers next contends the trial court erred in admitting evidence of the chemical breath test and testimony concerning other indicia of his intoxication because Officer Ezell was not authorized to arrest him. According to Myers, at the time of arrest the officer had neither taken nor completed the necessary training required of police officers pursuant to Ind.Code § 5–2–1–9(d) which provides in pertinent part:

[A] law enforcement officer appointed to a law enforcement department or agency after June 30, 1993, may not:

(1) make an arrest;

(2) conduct a search or a seizure of a person or property; or

5. In this regard we agree with the dissent in *State v. Pendleton*, 339 N.C. 379, 451 S.E.2d 274 (1994), *cert. denied*, 515 U.S. 1121, 115 S.Ct. 2276, 132 L.Ed.2d 280 (1995), a case factually similar to the one before us and whose reasoning we have adopted. We decline Myers' invitation to follow the majority view in that case.

(3) carry a firearm;

unless the law enforcement officer successfully completes, at a board certified law enforcement academy, the basic training requirements established by the board under this chapter.

There is no question that Officer Ezell did not complete the training anticipated by the statute. Rather, the record shows that he completed some amount of training at the Porter County Reserve Academy and a training program offered by the University. However, Ind.Code § 5–2–1–2 provides in pertinent part that the term " 'law enforcement officer' shall mean an appointed officer or employee hired by and on the payroll of the state or any .of its political subdivisions." As a private institution, Valparaiso University is not a political subdivision of the State. Thus, as an employee of the University, Officer Ezell was not the type of law enforcement officer regulated by Ind.Code § 5–2–1–1 *et seq.* Rather as a Valparaiso University police officer, Officer Ezell possessed "general police powers including the power to arrest, without process, all persons who within [his] view commit any offense." Ind.Code § 20–12–3.5–2(a).

■ Myers acknowledges the provisions of Ind.Code § 20–12–3.5–2(a). However in addition to a constitutional challenge, Myers mounts a multi prong attack on the statute that he summarizes as follows: "there is no justification, either legal or practical, for allowing individuals to enforce the law without undergoing the mandatory minimum training required of police officers throughout the state. Ezell's actions in this case were the same as those of any 'law enforcement officer.' " Brief of Appellant at 18. Myers makes a good point. However his argument is misdirected. Our legislature has apparently made a policy decision exempting university police officers from the rigors of mandatory Indiana Law Enforcement Academy training. We may not ignore the clear language of a statute and "in effect[ ] rewrite a statute in order to render it consistent with our view of sound public policy." *Robinson v. Monroe County*, 663 N.E.2d 196, 198 (Ind. Ct.App.1996) (opinion denying rehearing but acknowledging that clear language of statute

unambiguously exempts certain individuals from abiding by safety requirements); *see also Boehm v. Town of St. John*, 675 N.E.2d 318, 321 (Ind.1996) (noting that a "statute is not unconstitutional simply because the court might consider it born of unwise, undesirable, or ineffectual policies").

### III.

Lastly, Myers contends officer Ezell had no reasonable suspicion of criminal activity to justify the initial stop of his pick-up truck. Thus, the argument continues, the stop and subsequent seizure of incriminating evidence was in violation of his constitutional right against unreasonable searches and seizures. In this appeal Myers does not raise the argument asserted before the trial court that the officer lacked probable cause to arrest him.

■ In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court established the rule that a police officer can briefly detain a person for investigatory purposes if, based on specific and articulable facts together with rational inferences from those facts, "official intrusion upon the constitutionally protected interests" of private citizens is reasonably warranted. *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1879–80. Indiana courts follow the *Terry* guidelines. *Taylor v. State*, 639 N.E.2d 1052, 1054 (Ind. Ct.App.1994); *Platt v. State*, 589 N.E.2d 222, 225–26 (Ind.1992). Whether a particular fact situation justifies an investigatory stop is determined on a case by case basis. *Platt*, 589 N.E.2d at 226. The requirements of the Fourth Amendment are satisfied if the facts known to the officer at the moment of the stop are such that a person "of reasonable caution" would believe that the "action taken was appropriate." *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880. Indiana has adopted this test. *Gipson v. State*, 459 N.E.2d 366, 368 (Ind. 1984).

■ The record shows that Officer Ezell observed Myers' truck weave across the center lane of a two lane street, watched as the truck slowly turned into the oncoming lane of traffic on another street, and saw the door of Myers' truck swing open appearing to strike

a parked vehicle. Given this conduct it was reasonable for the officer to believe that further investigation was warranted. *See, e.g., Baran v. State,* 639 N.E.2d 642, 644 (Ind. 1994) (stop appropriate where vehicle weaved back and forth between lanes as it traveled along the interstate); *Jaremczuk v. State,* 177 Ind.App. 628, 630–31, 380 N.E.2d 615, 617 (1978) (stop appropriate where vehicle was weaving within the lane of traffic and momentarily left the roadway). A person of reasonable caution would believe the traffic stop in this case was appropriate.

In conclusion we hold that Ind.Code § 20–12–3–5.1 *et seq.* which permits the creation of university police forces is not unconstitutional; university police officers are not required by law to attend and complete training conducted by the Indiana Law Enforcement Academy; and the officer in this case had reasonable suspicion to initiate a traffic stop. Accordingly the judgment of the trial court is affirmed.

Judgment affirmed.

DARDEN, J., concurs.

SULLIVAN, J., concurs with opinion.

SULLIVAN, Judge, concurring

With one exception, I fully concur in the affirmance of the conviction and in the treatment of the issues by the majority opinion. That exception concerns the majority's conclusion that the General Assembly made a conscious policy decision in I.C. 20–12–3.5–2 to exempt university police from the training requirements of I.C. 5–2–1–9(d). Rather, I believe the failure to require such training of university police officers was a legislative oversight.

Minimum training requirements for municipal, county and state law enforcement officers were introduced into the law by Acts 1967, ch. 209, sec. 9. Statutory provisions for university police came about by virtue of Acts 1971, P.L. 329, sec. 1. Given the fact that such university police were vested with full powers of arrest, it seems unlikely that the legislature contemplated that the persons exercising such striking authority would do so with little or no training.

For this reason, I write separately not only to agree with the majority that we are not privileged to "rewrite a statute in order to render it consistent with our view of sound public policy" but also to strongly and explicitly encourage the General Assembly to address this omission at the earliest legislative opportunity. Op. at 284 (quoting *Robinson v. Monroe County* (1996) Ind.App., 663 N.E.2d 196, 198).