**Phillip L. FOREMASTER, et al., Plaintiffs,**

v.

**CITY OF ST. GEORGE, Defendant.**

**Civ. No. C85–1181G.**

United States District Court, D. Utah, C.D.

Feb. 25, 1987.

---

Brian M. Barnard, Salt Lake City, Utah, for plaintiffs.

T.W. Shumway, St. George, Utah, for defendant.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

The court first heard plaintiff Phillip L. Foremaster's (Foremaster) motion for summary judgment on September 2, 1986. At that time the parties requested leave to file additional materials. Thereafter plaintiffs Rev. Paul S. Kuzy, Rev. Rhett Durfee, Rev. Lester Wollard, Rev. Emory P. Huey, Rev. Elmer Luther Royer, Rev. A.M. White, Rev. Alex Wilkie (collectively referred to as the Washington County Ministerial Alliance or Ministerial Alliance) filed a separate action. On November 20, 1986 an Order was entered consolidating the action of the Ministerial Alliance with that of Foremaster. On December 30, 1986, this matter came on regularly on motions by Foremaster and the Ministerial Alliance for summary judgment and on motions by defendant to dismiss portions of plaintiffs'

complaints. Plaintiffs were represented by Brian M. Barnard and defendant was represented by T.W. Shumway. Plaintiffs and defendant submitted memorandums of law and the court heard oral argument, after which the court granted defendant's motions to dismiss as to another phase of the case,[1] and took plaintiffs' motions for summary judgment under advisement. The court now being fully advised, sets forth its Memorandum and Decision regarding plaintiffs' motions.

## FACTUAL BACKGROUND

This case involves a logo adopted and used by the City of St. George, Utah (City) for various purposes from approximately 1977 to present.[2] The logo depicts a local hill known as "Sugarloaf" with the word "Dixie" written on it, a setting sun, a golf course, a cluster of grapes, the motto "Where the Summer Sun Spends the Winter," the words "City of St. George, Utah Incorporated 1862" and a sketch of the St. George Temple of the Church of Jesus Christ of Latter-day Saints (members of the Church of Jesus Christ of Latter-day Saints are commonly referred to as "Mormons" or as members of the "LDS" faith). The parties have submitted this case for decision based upon the filing of extensive admissions, answers to interrogatories, affidavits, exhibits, memorandums and published depositions from which this court has distilled the following relevant facts regarding the logo.

### I. Original Implementation and Use of the Logo

In 1974 Rudger McArthur, Utilities Director of the City of St. George, directed that a "draftsman" be hired to create a logo to be placed on City vehicles that would serve, in part, as a "descriptive, colorful, attraction-getting" symbol to adver-

---

**1.** In that portion of the case plaintiffs challenged a credit on its monthly electrical bills given by the City of St. George to the account of the St. George Temple of The Church of Jesus Christ of Latter-day Saints. The credit in effect constituted payment for a portion of the late-night illumination of the exterior of the St. George Temple. This court granted defendant's motion to dismiss plaintiff Foremaster's Complaint as to the electricity credit based upon

lack of standing, and defendant's motion to dismiss the other plaintiffs' complaint as to the electricity credit issue based upon mootness in that the City had discontinued the credit. Jurisdiction of that phase of the case was retained by this court.

**2.** *See* Appendix A.

tise the St. George area. That original logo as described above was not immediately placed on City vehicles but was used on the official letterhead and stationery of the City from at least 1977 through April 1981. In 1981 the City adopted a new logo for use on its stationery which merely depicts a setting sun and the words "City of St. George" written across the sun. Sometime in 1983 the State of Utah informed the City that it was required to identify its motor vehicles. On September 15, 1983, the City counsel formally adopted the original 1974 logo for placement on vehicles, and the City ordered two hundred transfer decals. At that time decals were placed on the front doors of all City vehicles except police cars and emergency vehicles. At the end of 1984 the City decided that it would not place any new logos on its vehicles. However, at the time Foremaster's lawsuit was filed, the logo was still displayed on between eighty and ninety vehicles representing approximately two-thirds of the City's vehicles. The logo is also currently displayed on a wall plaque in the main foyer of the St. George City Hall and on two directional signs near the public parking lot of the Hall. In 1985 a public hearing was held after which the City refused to remove the logo from display. However, after this action was filed the City removed a flag located in the City Council chambers which displayed the logo. Also, the City has represented to this court and to plaintiffs that its intent since 1981 has been to retain the 1974 logo *only* "until replaced by the current logo adopted in 1981," except with regard to the one logo on the plaque displayed in City Hall.[3] The City intends to retain use of that plaque indefinitely unless enjoined by this court.

## II. *Religious Significance of Temples*[4]

"One of the distinctive features of the Church of Jesus Christ of Latter-day Saints is its teaching concerning the great importance of temples and the lasting significance of that which occurs in them."[5] According to Mormon belief, the gospel of Jesus Christ was restored to the earth through Joseph Smith who Mormons believe was a modern day prophet who received revelations from God.[6] Following the biblical pattern, Mormons believe God instructed Joseph Smith that certain sacred rites, "without [which people] cannot obtain celestial thrones," could be restored to the earth only though the building of temples.[7] Mormon history demonstrates that even during poverty and affliction, Mormons obeyed what they considered to be a directive from God to build temples.[8] Today

---

**3.** *See* Defendant's *Response to Plaintiff's Statement of Facts* at 21. Defendants have also offered to accelerate the phase-out begun in 1981 if this court determines that the case is moot and the following conditions are met:

(1) removal of the logo not be required from the small historical plaque in the lobby of the City Office Building where the architect, contractor, etc. of the building are commemorated; (2) all other uses of the logo be completely and permanently terminated within 60 days from the date of judgment herein; (3) completion of the logo's removal not be considered an acknowledgment by the City of its original use was improper; and (4) completion of the phase-out not be considered a judgment in favor of plaintiff so as to justify an award of attorney's fees. Otherwise, defendants would submit this issue to the court. . . .

Defendant's *Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment Re: City Logo* at 1–2.

**4.** Plaintiffs have filed a *Memorandum Re: Significance of Temples of the Church of Jesus Christ of Latter-day Saints.* This court's cita-

tions are to authorities cited in that memorandum.

**5.** *Temples of the Church of Jesus Christ of Latter-day Saints* at 1 (1981) (introduction to publication of the Corporation of the President of The Church of Jesus Christ of Latter-day Saints) [hereinafter cited as *Temples* ].

**6.** *See* Explanatory Introduction to *The Doctrine and Covenants of the Church of Jesus Christ of Latter-day Saints*, ". . . a collection of divine revelations and inspired declarations given for the establishment and regulation of the kingdom of God on the earth in the last days." Section 20 of that book specifically deals with restoration of the "gospel of Jesus Christ."

**7.** *Temples* at 60.

**8.** That history begins in 1832 when according to Mormon teaching, Joseph Smith received a revelation that a temple should be built in Kirtland, Ohio. See B. Packer, *The Holy Temple* at 128 (1980) [hereinafter cited as *Holy Temple* ]. Two years later the Kirtland Temple was abandoned and its founders moved as a result of religious opposition. J. Talmage, *House of the Lord* at 12

there are forty operating Mormon temples throughout various parts of the world and seven under construction and in the planning stages. It is the goal of Mormon leaders to have a temple "in all parts of the world." [9]

Mormons attach great significance to the activities in which they engage within Mormon temples. Admission to temples is not open to the public once they have been "dedicated" for use through a religious ceremony.[10] Further, even admission among members of the faith is restricted according to ecclesiastically established standards of "worthiness." [11] Although "temple ordinances" and "temple ceremonies" are kept confidential,[12] the authorities of the Mormon faith have disclosed certain information about the activities engaged in within their temples. For instance, "temple endowments" have been described as "instruction relative to the purpose and plans of the Lord in creating and peopling the earth ... [and the teaching of] what must be done ... to gain exaltation." [13] Mormon ecclesiastical authorities have also disclosed that worthy men and women may be "sealed in the holy bond of eternal matrimony" in temples.[14] Similarly, husbands and wives may be "sealed" with their children. According to Mormon doctrine "sealing ordinances" enable families to remain associated for eternity.[15] Mormons are also counseled to engage in genealogical research so that their ancestors can be sealed together for eternity through the performance of vicarious temple ordinances by living persons acting for the dead.[16] Mormons also believe that "[w]ith proper authority a mortal person [can] be baptized for and in behalf of someone who had not had the opportunity before passing on. That individual would then accept or reject the baptism in the spirit world, according to his own desire." [17] According to Mormon history, temples are also considered to be sacred places wherein personal revelations from God have been received.[18] Mormon temples are also significant to Mormon pro-

---

(1968). In April 1838, revelation was again received by Mormon authorities that a temple should be built in Far West, Missouri, but again due to religious opposition that temple was never completed. *Id.* at 103–04. Thereafter as a result of revelation, construction of a temple was undertaken on April 6, 1841 in Nauvoo, Illinois. *Id.* at 105; *House of the Lord* at 143. However, by September 1846 the completed Nauvoo Temple was in the possession of those who opposed the early Mormons. *House of the Lord* at 112. Despite fears of persecution in continuing to build temples, Brigham Young, president of the faith, persuaded his followers to begin building a temple in Salt Lake City, Utah in 1852. *Holy Temple* at 177–78. On November 9, 1871, President Brigham Young and other Mormon authorities broke ground for the St. George Temple. *House of the Lord* at 176. That temple was the first Mormon temple to be completed in Utah and was dedicated in 1877. *Id.* at 180. [Wilford W. Kirton, Jr., General Counsel of The Church of Jesus Christ of Latter-day Saints has filed an affidavit in this case in which he states that *Holy Temple* and *House of the Lord* are "authentic learned treatises within the meaning of Rule of Evidence 803(18) on the subject of history of the Temples of the Church of Jesus Christ of Latter-day Saints and the doctrine of the Church affecting Temples."]

**9.** Deseret News, *150 Years of Building Temples in the Church,* Section LDS Church News at 13 (March 16, 1986) (quoting past Mormon President Spencer W. Kimball.)

**10.** *Holy Temple* at 33.

**11.** *Id.* at 49–50.

**12.** *Id.* at 26.

**13.** *See* Holy Temple at 153–54 (quoting the "two published definitions or descriptions of the endowment").

**14.** Temple at 44.

**15.** *Id.*

**16.** *Holy Temple* at 223.

**17.** *Id.* at 18.

**18.** A recent example is a statement made by current Mormon President Ezra Taft Benson at a dedication of the newest Mormon temple:

> This temple will be a constant, visible symbol that God has not left man to grope in darkness. It is a place of revelation.
> Though we live in a fallen world—a wicked world—holy places are set apart and consecrated so that worthy men and women can learn the order of heaven and earth and obey God's will. I testify that temples are places of personal revelation. There have been times when I have been weighted down by a problem or a difficulty and have gone to the house of the Lord with a prayer in my heart for answers. These answers have come in clear and unmistakable ways.

Deseret News, *40th Temple dedicated in Denver,* Section LDS Church News at 3 (December 2, 1986) *see also Holy Temple* at 242–55; Plaintiff's *Memorandum Re: Significance of temples of the Church of Jesus Christ of Latter-day Saints* at 4–10 (documenting accounts of revelations received by Mormons at temples).

selyting. Most temple grounds have Visitor Centers which serve to advertise and proselyte for the Mormon religion. At such centers visitors are given copies of the *Book of Mormon,* which Mormons believe is scripture. Names and addresses are also obtained for active proselyting done by missionaries and other representatives of the religion. As an example, 218,000 people visited the Visitor's Center of the St. George Temple in 1983.[19]

### III. *Individual Perceptions of the Logo as a Symbol*

A number of affidavits have been offered which disclose individual observations and opinions as to the "typical" perception of the public with regard to the message that is portrayed by the sketch of the St. George Mormon Temple on the logo of the City of St. George. Those set forth herein are typical of the different perceptions presented by the parties. These are important because the parties have submitted this case for resolution based upon the record.[20]

Each of the plaintiffs who make up the Washington County Ministerial Alliance has filed an affidavit expressing his perception that:

> representation of the LDS Temple on the city logo/seal lends the power, prestige, endorsement, and financial support of the City of St. George to one church to the exclusion of others. This conduct creates coercive pressure, both direct and indirect, upon other religious groups and their members to conform to the prevailing (and apparently officially approved) religion. This conduct constitutes a danger to the freedoms and rights of the religious minorities in the City of St. George.

A typical affidavit submitted by the Ministerial Alliance also sets forth that the non-Mormon churches and buildings in St. George are "attractive, beautiful, sacred and are of great interest to the members of our church. Tourists and members of our faith, passing though St. George, often stop and worship with our congregation at our church." Plaintiff Foremaster has also filed an affidavit in which he states that his parents were members of the Mormon faith and that he was baptized into that faith. Foremaster states that as a symbol a Mormon temple has significant meaning to members of that faith. Further, based upon personal and family ties with Mormonism, and general activities in the St. George area, Foremaster states that the St. George Mormon Temple is the "unmistakable symbol to Mormons and non-Mormons of Mormonism as practiced in the St. George area." Foremaster also states that the logo "connotes to the average and casual observer a governmental sponsorship or approval of the LDS religion."

The City of St. George has filed the affidavit of Karl Brooks, mayor of the City, in which essentially he states that based upon experience as a member of the Mormon religion, "there is little if any relationship between the facade and exterior appearance of the temple and the religious ceremonies that are conducted within its walls...." Brooks further states:

> [I]f [the Mormon temple] is symbolic of anything, it symbolizes the history of the southwest corner of the State which we refer to as "Dixie"; that it necessarily plays a central role in any consideration of the area's history, culture, roots, and tradition, whether that consideration be secular or otherwise....

Defendant has also filed the affidavit of Sharon Isom, who is a member of the City

---

**19.** Defendant's *Response to Plaintiff's Statement of Facts* at 5–6.

**20.** In defendant's first memorandum in opposition to plaintiff's motion for summary judgment the City took the position that there were material issues of fact that would preclude this court from granting summary judgment. However, at oral argument on September 2, 1986, the city took the position that there were very few disputed issues of fact but that plaintiffs' statement of "undisputed facts" contained contestable legal conclusions about the ultimate issues in this case. The present position of both parties is that this court can determine the ultimate issue of whether an objective viewer would consider the City logo to be an endorsement of the Mormon religion based upon the evidence in the record.

Council and a member of the Mormon religion. Based upon her contact with people who have varying degrees of religious interest she states:

> [The Mormon temple] is not considered to be a trademark or religious symbol that is synonymous with that church or its beliefs; [rather] it is noted for its striking beauty and 19th century architecture and is more likely to be identified with the history and scenery of southwest Utah than anything else; [the temple] is distinctive, different from any other church building in the world and creates a feeling of pride among residents of the community as it is uniquely representative of St. George and southwestern Utah....

## LEGAL ANALYSIS

### I. *Establishment Clause*

■ Plaintiffs in this case allege that depiction of the St. George Mormon Temple on the logo of the City of St. George violates the Establishment Clause of the First Amendment.[21] In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court set down a three part test that remains the mainstay of Establishment Clause cases. According to the *Lemon* test the Establishment Clause is violated if any one of following three independent conditions are not met: (1) the governmental action must have a secular purpose; (2) the principle or primary effect of the governmental action must be one that "neither advances nor inhibits" religion; and (3) the governmental action must not foster an excessive government entanglement with religion. *Id.* at 612–13, 91 S.Ct. at 2111.

The *Lemon* test was recently applied by the Tenth Circuit to a county seal adopted by Bernalillo County, New Mexico. *Friedman v. Board of County Commissioners of Bernalillo,* 781 F.2d 777 (10th Cir.1985). In *Bernalillo* the court described the seal as follows:

The circular seal that plaintiff challenges in this action ... contains the phrases, "Bernalillo County," and "State of New Mexico," separated by two diamonds along its outermost green edge. Within an inner circle, the Spanish motto, "CON ESTA VENCEMOS," which translates into English as, "With This we Conquer," or "With This we Overcome," arches over a golden latin cross,[1] highlighted by white edging and a blaze of golden light. The motto and cross are set in a blue background depicting the sky over four darker blue mountains and a green plain. Eight white sheep stand on the plain.

*Id.* at 779 (the court's footnote states that the cross occupies roughly half of the seal). The district found that the significance of the cross and the sheep on the county seal was solely historical and therefore the seal passed all three parts of the *Lemon* test. However, the Tenth Circuit reversed as clearly erroneous the district court's determination on the "effects" prong of *Lemon. Id.* at 780.[22] The court described the effects test as follows:

> [T]he existence of a non-secular effect is to be judged by an objective standard, which looks only to the reaction of the average receiver of the government communication or average observer of the government action.... If the challenged practice is likely to be interpreted as advancing religion, it has an impermissible effect and violates the Constitution, regardless of whether it actually is intended to do so.
>
> In addition, the resulting advancement need not be material or tangible. An implicit symbolic benefit is enough.

*Id.* at 781. In concluding that the county seal had the effect of "advertising" the Catholic faith to the objective viewer, the court emphasized two critical factors. First, the court looked at the message of oppression that in the eyes of some was symbolized by the Bernalillo County cross and motto. Specifically, the court dis-

---

**21.** U.S. CONST. amend I. "Congress shall make no laws respecting an establishment of religion...."

**22.** The court did not disrupt the district court's determination on the other two prongs of *Lemon. Id.* at 780 n. 3.

cussed expert testimony from historians to the effect that religious conversion of the Native American population in New Mexico was sometimes accomplished through force. Another historian testified of the use of Spanish Inquisition tactics in New Mexico. With that historical background, the court considered further expert testimony that the motto, "With This We Conquer," referred explicitly to the cross pictured on the seal. The court also considered testimony that the cross had at times symbolized outright oppression and persecution of Jewish people. The Tenth Circuit concluded that based upon that background, the "seal certainly does not memorialize ... [the Native American] 'Christian heritage' but rather that of those who sought to extinguish their culture and religion." *Id.* at 782.

The second factor of great importance in the court's determination was the context within which the seal was displayed. The court first noted that the cross was prominently displayed on the logo and occupied approximately half of the seal. *Id.* at 779 n. 1. The court also emphasized that the seal itself was used on county vehicles and to identify law enforcement officers, thereby creating doubt in the mind of a follower of a non-Christian religion about the even-handedness of the enforcement officer's treatment. The court distinguished the religious prominence of the cross and motto from the creche in *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) which was displayed within a "generally secular commercial display." The court also pointed out that "the seal, unlike the creche, pervades the daily lives of county residents." 781 F.2d at 782. Finally, the court observed that a less conspicuous use of the seal, such as "a notary seal on county documents or a one-color depiction in which the seal and especially the cross

are not easily discernible might" pass Constitutional scrutiny. *Id.* at 781.

The plaintiffs in this case rely exclusively on the effects prong of the *Lemon* test to attack the logo of the City of St. George. Therefore, the critical issue becomes whether the City's logo, as in *Bernalillo,* has the primary effect of conveying to that average observer that the City is endorsing or advertising a particular religion. The parties have agreed that such determination is "a legal question to be answered on the basis of judicial interpretation of social facts."[23] After careful review of the facts this court determines that the City's logo is distinguishable from the seal in *Bernalillo* and properly passes the effects prong of *Lemon.*

The context within which the Mormon temple is depicted is far different than the singular message of the cross and motto in *Bernalillo.*[24] The City logo depicts a number of secular attractions in the St. George area including a golf course, the local red rock formations, a blazing sun, and the Virgin River. The motto "Where the Summer Sun Spends the Winter" also portrays a secular message. The word "Dixie" written upon the red rocks is also generally regarded as a reference to the comparatively mild climate of the area. In those circumstances one clear message of the logo is that "these are the things to do and places to see in the City of St. George." The Mormon Temple also fits within that secular message. The parties agree that the St. George Mormon Temple is a building "of striking and dramatic design and architecture ... [which] is the predominant man-made structure of the entire city and area. The pure white stucco exterior of the ... Temple makes it stand out from the surrounding natural red sand and stone of the area."[25] The temple thus has a secular

---

23. *See Lynch v. Donnelly,* 465 U.S. 668, 694, 104 S.Ct. 1355, 1370, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring); *American Civil Liberties Union of Illinois v. City of St. Charles,* 622 F.Supp. 1542, 1546 (D.C.Inc.1985), *aff'd* 794 F.2d 265 (7th Cir.1986).

24. In *Bernalillo* the cross occupied approximately half of the entire seal and the only other illustration on the seal was a sketch of eight

sheep. There was a vigorous dispute over whether the sheep represented the "flock of Jesus," or the historical importance of the sheep-raising industry in Bernalillo County. 781 F.2d at 779.

25. *Statement of Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment* at 6; *Defendant's Response to Plaintiff's Statement of Facts* at 7.

beauty and attraction apart from the building's religious significance.[26]

The symbolic significance of the St. George Mormon Temple is also distinguishable from the cross in *Bernalillo*. In *Bernalillo* the court emphasized that the cross exemplified the regional history of oppression and persecution by those who embraced the cross as their religious symbol. The Mormon temple does not carry a similar message.[27] However, plaintiffs contend that a Mormon temple is a powerful symbol of the "core, main tenets, basic thought and essence" of the Mormon religion that cannot be removed regardless of the secular context within which the temple appears. Plaintiffs point out that Mormons conduct confidential sacred rites within temples and that temples are places where faithful members of the religion claim to have received personal revelations. It is also stressed that Mormon temples may symbolize the continued perseverance of the religion's faithful against historical persecution, and that temples are significant proselyting tools of the Mormon faith. In those circumstances, plaintiffs conclude that "[s]ymbolically, a cross is to Christianity as a temple is to the [Mormon] Church."

However, the fact that Mormon temples have great religious significance does not necessarily result in a violation of the Establishment Clause of the First Amendment. The Supreme Court in *Lynch v. Donnelly*, 465 U.S. 668, 687, 104 S.Ct. 1355, 1366, 79 L.Ed.2d 604 (1984) recognized that a creche has great religious significance. Nevertheless, the court emphasized that the relevant inquiry is whether the *primary effect* of the governmental action is to create an endorsement of religion. *Id.* at 681–82, 104 S.Ct. at 1363. In *Lynch* the Court concluded that despite the religious significance of the creche the City's display could not be considered

more an endorsement of religion, for example, than expenditure of large sums of public money for textbooks supplied throughout the country to students attending church-sponsored schools, *Board of Education v. Allen*, [392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968);] ... expenditure of public funds for transportation of students to church-sponsored schools, *Everson v. Board of Education* [330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947);] ... federal grants for college buildings of church-sponsored institutions of higher education combining secular and religious education, *Tilton [v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971);] ... noncategorical grants to church-sponsored colleges and universities, *Roemer v. Board of Public Works* [426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976);] ... and the tax exemptions for church properties sanctioned in *Walz [v. Tax Comm'n*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)].... It would also require that we view it as more of an endorsement of religion than the Sunday Closing Laws upheld in *McGowan v. Maryland* [366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961);] ... the release time program for religious training in *Zorach [v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952); ] ... and the legislative prayers upheld in *Marsh [v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983)]....

---

**26.** Plaintiffs argue that the City's logo, like the Bernalillo County seal, and unlike the *Lynch* creche, pervades the daily lives of City residents. Although such pervasiveness is clearly an important factor it is not determinative given the otherwise secular context within which the Mormon temple is illustrated. In addition, the pervasiveness here is not necessarily the same as in *Bernalillo* because here the logo is not used on police or emergency vehicles.

**27.** Plaintiffs have attempted to argue that the St. George Temple "may be a reminder of the Mountain Meadows Massacre of the 1850's

where members of the LDS Church slaughtered non-Mormons traveling through Southern Utah...." Plaintiffs' argument is unpersuasive. Whatever speculative present day "oppression" of non-Mormons of all races may be said to exist pales in comparison with the reality of lingering oppression of Native Americans that was recognized in *Bernalillo*. In other words, we find it highly unlikely that a non-Mormon with knowledge of Mormon history, including the "Mountain Meadows Massacre," would suffer in any way from anxiety in dealing with a Mormon as a result of that knowledge.

*Id.* The logo of the City of St. George is no more an endorsement of religion than the numerous examples given by the Supreme Court of cases where a governmental benefit or endorsement of religion has passed Constitutional scrutiny. The religious significance of a Mormon temple is not so pervasive as necessarily to overcome an otherwise secular message concerning the beauty and attractiveness of a particular area. Within the facts of this case this court holds that the illustration of the St. George temple on the City's logo does not have the primary effect of conveying a message of religious endorsement to the objective viewer.

## II. *Equal Protection*

■ The Ministerial Alliance plaintiffs have alleged that portrayal of the Mormon St. George Temple on the City's logo violates the Equal Protection Clause of the Fourteenth Amendment. The Ministerial Alliance takes the position that their fundamental rights of religious freedom are "tramped upon" by the City's endorsement of the Mormon faith. However, the plaintiff's argument necessarily fails given this court's determination that depiction of the St. George Temple in a clearly secular context does not have a primary or principal effect of endorsing the Mormon religion. The only "distinction" made by the City's logo is between popular attractions in the City of St. George. As a result there is no suspect class or fundamental right involved that would require a heightened "strict scrutiny" analysis under equal protection. Accordingly, distinctions among the City's popular attractions clearly pass the "rational basis test" of equal protection. Indeed, the plaintiffs in their own statement of undisputed facts have said that the St. George Temple is a building "of striking and dramatic design and architecture ... [which] is the predominant man-made structure of the entire City and area." Plaintiffs, however, also contend that the buildings and chapels used by the Ministerial Alliance are "attractive, beautiful, sacred and of great interest to the members of our church" and to others. While this court does not doubt plaintiffs' statement, the City does not have unlimited space available on its logo to portray all of the beautiful buildings and natural attractions in the City of St. George. In those circumstances, it is rational for the City to choose the Mormon temple along with other natural attractions as being of interest to those who visit St. George.

Based upon the above analysis Plaintiffs' motion for summary judgment is denied. This Memorandum Decision and Order will suffice as the court's final action on this motion; no further Order need be prepared by counsel.