# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3547

_____

Thomas Robb; Knights of the Ku Klux           *
Klan, an Arkansas Corporation; Ralph          *
Griffith; Knights of the Ku Klux Klan         *
Realm of Missouri, Unit 188, an               *
unincorporated association,                   *
                                              *
             Appellees,                       *
                                              *   Appeal from the United States
        v.                                    *   District Court for the Eastern
                                              *   District of Missouri.
Henry Hungerbeeler, in his official           *
capacity as Director of the Missouri          *
Highways and Transportation                   *
Commission; S. Lee Kling; Edward D.           *
Douglas; Ollie W. Gates; W. L.                *
Orscheln; William E. Gladden; Marjorie *
B. Schramm, in their official capacities      *
as commissioners of the Missouri              *
Highway and Transportation                    *
Commission; Don Hillis, in his official       *
capacity as State Maintenance Engineer, *
                                              *
             Appellants.                      *

_____

Submitted: April 12, 2004

Filed: June 3, 2004

_____

Before MORRIS SHEPPARD ARNOLD, RILEY, and COLLOTON, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Unit 188 of the Knights of the Ku Klux Klan, a Missouri-based chapter of a non-profit corporation that was chartered in Arkansas in 1994, applied to participate in Missouri's Adopt-A-Highway (AAH) program. Participants in the AAH program agree to collect litter along a specific portion of highway at least twice every six months, *see* Mo. Code Regs. Ann. tit. 7, § 10-14.040(2)(J) (2001), and in return the Missouri Highways and Transportation Commission (the State) installs signs bearing the name of the adopter at both ends of the adopted section, *see id.* at §§ 10-14.040(3)(B), 10-14.050 (2001). After the State notified Unit 188 that its application was denied because it did not meet the AAH program's eligibility requirements that were set forth in state regulations, Unit 188, its unit coordinator, the Arkansas-based corporation, and that corporation's national director brought suit seeking declaratory and injunctive relief pursuant to 42 U.S.C. § 1983. The district court[1] granted the plaintiffs' motion for summary judgment, holding that the State's reasons for denying Unit 188's application were unconstitutional. *See Robb v. Hungerbeeler*, 281 F. Supp. 2d 989 (E.D. Mo. 2003).

The State appeals. It argues first that the district court erroneously concluded that it is collaterally estopped from litigating the constitutionality of its denial of Unit 188's application based on Unit 188's racially discriminatory membership criteria. Second, it maintains that the district court erred in holding that the State's application of a regulation barring participation in the AAH program by organizations for which courts have taken judicial notice of a history of violence violated Unit 188's first

_____

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

-2-

amendment rights, applied to the states through the fourteenth amendment. Reviewing the district court's judgment *de novo*, we affirm.

## I.

This is the third appeal to this court arising out of the State's ongoing efforts to keep Missouri Klan groups out of the AAH program. In the first case, *State of Mo. ex rel. Mo. Highway & Transp. Comm'n v. Cuffley*, 112 F.3d 1332, 1333 (8th Cir. 1997), the State, planning to deny a Klan group's application to participate in the program, filed an action seeking a declaratory judgment that it was not required to approve the application. We ordered the action dismissed, concluding that it involved neither a properly presented federal question nor a controversy that was ripe for review. *Id.* The State subsequently denied the group's application based, *inter alia*, on state regulations then in place that barred applicants that "discriminate on the basis of race, religion, color, national origin or disability" or that have "a history of unlawfully violent or criminal behavior." Mo. Code Regs. Ann. tit. 7, § 10-14.030 (1995). Another lawsuit ensued, and we affirmed the district court's grant of injunctive and declaratory relief to the Klan group, holding that requiring the group to abandon its racially restrictive membership policy as a condition of participating in the AAH program violated its constitutionally protected right of political association, and that the State's other proffered rationale for denying the application – that the organization had a history of unlawfully violent or criminal behavior – was mere pretext for unconstitutional viewpoint-based discrimination. *See Cuffley v. Mickes*, 208 F.3d 702, 704, 708-10 (8th Cir. 2000) (*Cuffley II*), *cert. denied*, 532 U.S. 903 (2001).

In response to *Cuffley II*, the State made some minor changes to its regulations, and Unit 188 then submitted the application to participate in the program that is at issue here. The State, citing the amended regulations, *see* Mo. Code Regs. Ann. tit. 7, § 10-14.030(2) (2001), denied the application on the grounds that a so-called "judicial notice check" had purportedly confirmed that "courts have taken judicial notice of a

history of violence by the Knights of the Ku Klux Klan," and the application revealed that the "group denies membership on the basis of race, color or national origin."

## II.

The district court concluded that the State was collaterally estopped from litigating the propriety of excluding Unit 188 from the AAH program pursuant to the discriminatory membership regulation, because of our holding in *Cuffley II* that barring a Klan group from the program because of its discriminatory membership criteria was unconstitutional. "Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979).

For collateral estoppel purposes, the defendants here are functionally the same as those in *Cuffley II*. In both cases, several officials of the Missouri Highways and Transportation Commission were sued in their official capacities. Because "the real party in interest in an official-capacity suit is the governmental entity and not the named official," *Hafer v. Melo*, 502 U.S. 21, 25 (1991), "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). In *Cuffley II* and here, the defendants represented the interests and positions of the Missouri Highways and Transportation Commission.

The plaintiffs in this case, however, were not parties in *Cuffley II*. The plaintiffs here are the unincorporated association "Knights of the Ku Klux Klan Realm of Missouri, Unit 188," the Arkansas corporation "Knights of the Ku Klux Klan," Thomas Robb (the national director of the Arkansas-based Klan corporation), and Ralph Griffith (the unit coordinator for Unit 188), whereas the plaintiffs in *Cuffley II* were a different Missouri branch of the Klan (which also operated under Mr. Robb's supervision, but was unrelated to Unit 188), and Michael Cuffley (a unit recruiter for the Klan). Where a plaintiff is seeking to estop a defendant from

-4-

relitigating an issue which the defendant previously litigated and lost against another plaintiff, trial courts have broad discretion to determine whether estoppel should be applied. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329, 331 (1979).

We held in *Cuffley II*, 208 F.3d at 708-09, that requiring the Klan group to refrain from racial discrimination constituted "an unconstitutional condition on the Klan's participation in the Adopt-A-Highway program." Our resolution of this legal issue was necessary to our judgment affirming the grant of summary judgment for that Klan group. We agree with the district court that the State is presently attempting to re-litigate the same issue, which it had a full and fair opportunity to litigate in *Cuffley II*. We thus conclude that the district court properly exercised its discretion in applying an estoppel against the State.

The State urges us to hold that it is not estopped from litigating the issue of the legality of barring Unit 188 from the program based on its discriminatory membership criteria because the language of the regulation applied in the present case is slightly different from the language at issue in *Cuffley II*. Specifically, the regulation in *Cuffley II* required that participating organizations " 'not discriminate on the basis of race, religion, color, national origin or disability,' " *id.* at 708 (quoting Mo. Code Regs. Ann. tit. 7, § 10-14.030(2)(B) (1995)), while the regulation applied here allows organizations to participate only if they "do not deny membership on the basis of race, color, or national origin," Mo. Code Regs. Ann. tit. 7, § 10-14.030(2) (2001). The regulation's amendment failed to address the constitutional defects that we noted in *Cuffley II*, other than by deleting disability and religion from the list of prohibited bases for discrimination by AAH participants, and we think that the State's argument that the issue presented in this case is somehow different because of these changes is wholly disingenuous.

In *Cuffley II*, we determined that "requiring the Klan to accept non-'Aryans' would significantly interfere with the Klan's message of racial superiority and

segregation," *id.* at 708, and that the "State simply cannot condition participation in its highway adoption program on the manner in which a group exercises its constitutionally protected freedom of association," *id.* at 709. The State's newfound willingness to allow highway adopters to discriminate based on disability and religion does nothing to cure this infringement upon applicants' associational rights. The district court correctly observed that the new regulations "still allow the Commission to reject those applicants who discriminate in their membership criteria," and that the "Eighth Circuit has conclusively held that this violates the Klan's First Amendment right to freedom of association." *Robb*, 281 F. Supp.2d at 996; *cf. Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000). Even assuming that the issue arising out of the application of the present regulation to Unit 188 is not identical to the one that we decided in *Cuffley II*, and that collateral estoppel is thus inappropriate, *stare decisis* obligates us to apply the same principles that we applied in that case and hold that the State may not require that Unit 188 refrain from discriminating based on race in order to participate in the AAH program.

### III.
#### A.

As we have already said, the State also argues that it lawfully barred Unit 188 from the AAH program because Unit 188 did not meet the requirements of a regulation that limits the class of organizations eligible to participate in the program to those "for whom state or federal courts have not taken judicial notice of a history of violence." Mo Code Regs. Ann. tit. 7, § 10-14.030(2) (2001). We think that this argument rings hollow because the State has not shown that the regulation, by its own terms, applies to Unit 188. The regulation itself is vague, and the limits of its exclusion are unclear, but the State has failed to make any legitimate showing that Unit 188 violates its requirements, and this leads us to find that the State is using the regulation as a smokescreen to justify excluding Unit 188 because of its controversial political views.

Mr. Griffith completed and filed Unit 188's application for participation in the AAH program, indicating on the application that the request was being made on behalf of a group or organization, and in the space provided for the "full name and street address of the group or organization," he wrote "Knights of the Ku Klux Klan Unit #188" followed by an address in Potosi, Missouri. At the end of application, in the space labeled "Adopter Name," Mr. Griffith wrote "Knights of the Ku Klux Kl."

The State contends that, for the purposes of the "history of violence" inquiry, the relevant entities are any groups that have ever used the name "Knights of the Ku Klux Klan" rather than Unit 188, or the Arkansas-based corporation that Unit 188 is affiliated with, specifically, and that any cases noticing historical violence by the "Knights of the Ku Klux Klan" are proper grounds for barring Unit 188 from the AAH program, whether or not those cases deal with Unit 188 or its members or affiliates. The parties have stipulated that a "judicial notice check" run by the State found several "cases in which courts had taken judicial notice of a history of violence by the 'Knights of the Klu [*sic*] Klux Klan.' " They have also stipulated that the State is "unaware of whether Thomas Robb, Ralph Griffith, or Unit 188 has a history of violence," that the State's "judicial notice check" "revealed no court having ever taken judicial notice of a history of violence of Thomas Robb, Ralph Griffith, or any other members of Unit 188," and that it also "did not reveal any connection between Unit 188 and the group that had a history of violence."

It seems plain to us that the regulation's exclusion of organizations "for whom state or federal courts have ... taken judicial notice of a history of violence" cannot be reasonably construed to apply to organizations for whom no judicial notice of a history of violence has ever been taken, but who have a name that is similar or identical to that of an organization for whom such judicial notice has been taken. Over the course of many years, numerous organizations have used the words "Knights of the Ku Klux Klan" in their name. These different groups have had varying philosophies and proclivities for violence; some have been formally or informally

affiliated with one another, while others have remained independent. In conducting its "judicial notice check," the State has made no effort to account for the widespread use of the name "Knights of the Ku Klux Klan" by groups of various kinds. Indeed, the State conceded during oral argument that it had little knowledge of the organizational structure of groups utilizing the name "Knights of the Ku Klux Klan." The mere fact that an applicant's organizational name includes certain widely-used language that has been used in the past by groups for which judicial notice has been taken of having a history of violence is inadequate to demonstrate that the applicant itself violates the dictates of the regulation. There has been no individualized inquiry to confirm that, or even discern whether, Unit 188, Mr. Robb's Arkansas-based corporation, or any of the members of these organizations themselves have had the requisite judicial notice of a history of violence to trigger the application of the exclusionary regulation. Because the State's proffered reason for excluding Unit 188 lacks any sort of plausible evidentiary support, we think it manifest that the exclusion was motivated by the State's discriminatory animus against Unit 188's views.

B.

To the extent that the State has interpreted the regulation as allowing it to deny Unit 188 access to the AAH program simply because it has chosen to adopt a name similar to that used by others who have had judicial notice taken of a history of violence, that interpretation violates our holding in *Cuffley II*, 208 F.3d at 706 n.3, that the State "may not deny access to the Adopt-A-Highway program based on the applicant's views." An organization's choice of name expresses a distinct message to the community about its character and views, and the type of "judicial notice check" that the State has purportedly applied here has denied Unit 188 access to the AAH program based solely on its name, without regard to whether judicial notice has ever been taken of Unit 188 itself or the Arkansas-based corporation it is affiliated with having a history of violence.

-8-

The principles announced by the Supreme Court in *Healy v. James*, 408 U.S. 169 (1972), are relevant here. In *Healy*, a "local chapter" of Students for a Democratic Society (SDS) applied to obtain official campus recognition, and the students' college denied the application because the national SDS organization (which was divided into several factional groups, and was not affiliated with the local chapter), had a philosophy of "disruption and violence," which was "contrary to the approved policy" of the college. *Id.* at 174-75 & n.4. The student chapter, while remaining independent, had chosen to use the nationally known name because it "brings to mind the type of organization we wish to bring across," *id.* at 173 n.3. The Court held that the students' group could not be denied recognition solely because of the national organization's philosophy and history, stating that "guilt by association alone, without establishing that an individual's association poses the threat feared by the Government, is an impermissible basis upon which to deny First Amendment rights." *Id.* at 186 (internal quotations omitted). The State here has similarly infringed upon Unit 188's expressive and associational rights to the extent that it has denied it the ability to participate in the AAH program based on its choice of name and the conduct of other groups and individuals associated with that name.

## C.

Even assuming that Unit 188 does not comply with the letter of the "history of violence" regulation, we conclude that the regulation is unconstitutional. In *Cuffley II*, 208 F.3d at 709-10, we observed that the regulation at issue barring all applicants with a "history of ... criminal behavior" had "incredible breadth," as it purported to exclude everybody "who has ever committed any criminal act, from murder and mayhem to joyriding and jaywalking." Noting that the AAH program "would soon have few adopters" were the State to enforce the regulation with any regularity, and that it had in fact not been enforced with any regularity, we concluded that it had been employed "to target only the Klan and its views." *Id.*

-9-

The breadth of the present regulation is similarly problematic. Taken at face value, it bars organizations that have had historically committed violence that did not involve violating any laws, took place in the distant past, or was committed by deviant members no longer affiliated with the organization noticed by the courts. Under this regulation, football and hockey teams could be prohibited from adopting highways if they have ever been involved in litigation in which a court noticed the violence that inheres in those sports, *see, e.g., Hackbart v. Cincinnati Bengals, Inc.*, 601 F.2d 516, 520 (10th Cir. 1979), *cert. denied*, 444 U.S. 931 (1979). Many labor unions that have been embroiled in heated labor disputes could also be barred from the program. *See, e.g., Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 748 (7th Cir. 1976). Any organization affiliated with the Church of Jesus Christ of Latter-day Saints could be subject to exclusion based on judicial notice of the "Mountain Meadows Massacre," in which members of the Latter-day Saints church slaughtered non-Mormons traveling through Utah in the 1850's, *see Foremaster v. City of St. George*, 655 F. Supp. 844, 851 n.27 (D. Utah 1987), *rev'd*, 882 F.2d 1485 (10th Cir. 1989), *cert. denied*, 495 U.S. 910 (1990). Indeed, under the State's expansive interpretation of the regulation, any group affiliated with the Democratic or Republican parties could be ineligible to participate in the program based on judicial notice of the debate over the adoption of the Minnesota constitution, during which "Republicans and Democrats exchanged not only ugly and racist epithets, but physical blows." *See State v. Wicklund*, 1997 WL 426209, at *5 (Minn. Dist. Ct. July 24, 1997), *rev'd*, 576 N.W.2d 753 (Minn. Ct. App. 1998), *aff'd*, 589 N.W.2d 793 (Minn. 1999).

In light of the substantial breadth of the regulation, the reasons advanced by the State in support of the regulation are insufficient to justify the restrictions on expression and association that it creates. Considering the purpose of the AAH program – "to provide volunteer community support for anti-litter and highway beautification programs with the potential for a cost savings to the Missouri Department of Transportation for use for other highway purposes," Mo. Code Regs.

Ann. tit. 7, § 10-14.010(1) (2001) – there is simply no rationale for excluding the diverse array of groups from the program that the regulation permits the State to bar from participation.

If the State's goal is to enhance public safety by discouraging people who are presently involved in violent criminal activity from committing those acts on the highways, the regulation's sweep is clearly over-inclusive. As we already noted, the regulation's exclusion is not limited to groups whose violent history is recent or criminal in nature. The State also may not censor AAH applicants' speech because of the potential responses of its recipients. "The first amendment knows no heckler's veto," and the State's desire to exclude controversial organizations in order to prevent "road rage" or public backlash on the highways against the adopters' unpopular beliefs is simply not a legitimate governmental interest that would support the enactment of speech-abridging regulations. *See Lewis v. Wilson*, 253 F.3d 1077, 1081-82 (8th Cir. 2001), *cert. denied*, 535 U.S. 986 (2002).

The district court determined that, in establishing the AAH program, the State created a nonpublic forum, which is public property that is not by tradition or designation a forum for public communication. *See International Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79 (1992). "In addition to time, place, and manner regulations, the State may reserve [a nonpublic] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Families Achieving Independence and Respect v. Nebraska Dep't of Soc. Servs.*, 111 F.3d 1408, 1419 (8th Cir. 1997) (en banc). Speech restrictions relating to public fora are subject to more exacting scrutiny. *See id.* at 1418-19.

Whatever type of forum the AAH program (and the highways it takes place on) might be, the regulation at issue here is facially invalid because it sweeps too broadly

with respect to any conceivable reasonable purpose that it might be designed to serve. If the regulation were enforced consistently and evenhandedly, the resultant burdens on speech would be unreasonable in light of the purposes served by the AAH program. Such an overly broad regulation, moreover, is likely to be applied selectively by the State; indeed, no organization other than Unit 188 has ever had its application denied based on this regulation. The timing of the regulation (it was promulgated in response to our holding in *Cuffley II* that exclusion of a Klan group pursuant to a prior regulation was unconstitutional), and the fact that Unit 188 is the only group that it has ever been used to exclude, strongly suggests that it has been used as a pretext to target the Klan group in a viewpoint-discriminatory manner.

## D.

The State contends that whether its exclusion of Unit 188 was the result of viewpoint-based discrimination is beside the point because the only speech that the AAH program implicates is that of the government itself. The government is allowed "to regulate the content of what is or is not expressed when it is the speaker." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). In the State's view, the government "speaks" by composing and erecting the signs identifying the adopter, while the adopter itself engages in no protected speech by participating in the program, and thus the exclusion of Unit 188 pursuant to the regulation could not have abridged its freedom of speech.

The State's contention that it is entitled to engage in viewpoint-based discrimination because the AAH program involves only government speech is unavailing. It argues that this case is similar in relevant respects to *Knights of the Ku Klux Klan, Realm of Mo. v. Curators of the Univ. of Mo.*, 203 F.3d 1085 (8th Cir. 2000), *cert. denied*, 531 U.S. 814 (2000), in which we held that a publicly-owned radio station was not obligated to accept a Klan group's application to underwrite a radio program because the station's underwriting acknowledgments were government speech. In *Cuffley II*, 208 F.3d at 706 n.3, however, we distinguished *Curators* as

"rest[ing] largely on the unique context of public broadcasting, in which editorial discretion to select programming and sponsors looms large," and involving "absolutely no showing of viewpoint discrimination." We considered and rejected the argument that the State is entitled to discriminate based on applicants' viewpoints in *Cuffley II*, where we held that "the State may not deny access to the Adopt-A-Highway program based on the applicant's views" whether or not the Klan was " 'speaking' for the purposes of the First Amendment." *Id.*

Participation in the AAH program, in any event, does entail some degree of private "speech" protected by the first amendment. The first amendment's prohibition against "abridging the freedom of speech," U.S. Const. amend I, applies not only to verbal expression, but also to symbolic or expressive conduct that is "sufficiently imbued with elements of communication," *Spence v. Washington*, 418 U.S. 405, 409 (1974). For example, the Supreme Court has suggested that participation in a parade by an Irish-American homosexual group is "expressive" for first amendment purposes. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569-70 (1995). "[A] narrow, succinctly articulable message is not a condition of constitutional protection." *Id.* at 569. We conclude that taking part in the AAH program, and receiving the attendant recognition on the signs is "sufficiently imbued with elements of communication" to constitute a form of private expressive conduct entitled to first amendment protection.

The fact that the AAH program involves some state speech that inheres in the signs' design (e.g., the decision to display only the adopter's name, and no symbols, logos, or advertising, on the signs) does not eviscerate the expressive element of the adopters' election to participate in the program. In contrast to *Curators*, the editorial discretion exercised by the State in running the AAH program is minimal: there is scant creativity involved in producing the signs identifying the program participants, and the underlying purpose of the program is unrelated to the dissemination of governmental messages. Highway adopters, moreover, participate in the program in

large part so that they can express a particular message:  their solidarity with the community and their wish to become known as promoters of clean highways. Although the signs are state owned, an adopter speaks through the signs by choosing to undertake the program's obligations in exchange for the signs' announcement to the community that it is a highway adopter.

## IV.

In sum, our holding in *Cuffley II* establishes that the State may not deny Unit 188's AAH application because it discriminates on the basis of race, and exclusion of Unit 188 pursuant to the "history of violence" regulation unconstitutionally restricts its expressive and associational rights.  We thus affirm the district court's grant of the plaintiffs' motion for summary judgment.

_____