**Elwood STROUT, et al., Plaintiffs, Appellants,**

v.

**J. Duke ALBANESE, In His Official Capacity as Commissioner, Maine Department of Education, etc., et al., Defendants, Appellees.**

No. 98–1986.

United States Court of Appeals, First Circuit.

Heard Feb. 4, 1999.

Decided May 27, 1999.

*Hedman,* 655 F.2d 813, 814–15 (7th Cir. 1981).

Vincent P. McCarthy, with whom Ann–Louise Lohr, The American Center for Law and Justice, Northeast, Brian W. Raum, American Center for Law and Justice, New York, Stephen C. Whiting, The Whiting Law Firm, P.A., Jay A. Sekulow and American Center for Law and Justice, Inc. were on brief, for appellants.

Peter J. Brann, State Solicitor, with whom Andrew Ketterer, Attorney General,

and Paul Stern, Deputy Attorney General, were on brief, for appellee Commissioner, Maine Department of Education.

A. Van C. Lanckton, Craig & MacCauley, PC and Marc D. Stern on brief for American Jewish Congress, amicus curiae.

Robert H. Chanin, John M. West, Alice O'Brien, Bredhoff & Kaiser, P.L.L.C., Donald F. Fontaine, Fontaine & Beal, P.A., Steven K. Green, Ayesha N. Khan, Elliot M. Mincberg, Judith E. Schaeffer, Barbara G. Shaw, Marcus, Grygiel & Clegg, PA, Jeffrey A. Thaler, Bernstein, Shur, Sawyer & Nelson, Elizabeth J. Coleman, Steven M. Freeman, Lauren A. Levin and David Rosenberg on brief for Maine Education Association, National Education Association, Americans United for Separation of Church and State, People for the American Way Foundation, Maine Civil Liberties Union, and Anti–Defamation League of B'nai B'rith, amici curiae.

Before Torruella, Chief Judge,
Campbell, Senior Circuit Judge, and Stahl, Circuit Judge.

TORRUELLA, Chief Judge.

As we embark upon resolution of the thorny questions presented by this appeal, it is appropriate that we keep in mind that "[c]onstitutional adjudication does not lend itself to the absolutes of the physical sciences or mathematics." *Tilton v. Richardson*, 403 U.S. 672, 678, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). The controversy before us patently reflects this truth.

The issues raised require us to consider the sometime competing values found in the Religion Clauses of the First Amendment of the Constitution [1]—otherwise described as "the internal tension in the First Amendment between the Establishment Clause and the Free Exercise Clause." *Id.* at 677, 91 S.Ct. 2091. "[B]oth are cast in absolute terms, ... either of which, if expanded to a logical extreme, would tend to clash with the other." *Walz v. Tax Commission*, 397 U.S. 664, 668–69, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

## BACKGROUND

Maine has enacted a statute providing schooling for those students who live in communities that do not have public education facilities because of insufficient student density.[2] For these students, the state will pay grants *directly* to qualified private educational institutions to subsidize their schooling, provided the institutions are "non-sectarian" in nature.[3]

Plaintiff–Appellants are the parents of students who are otherwise qualified to receive the benefits of this state-created subsidy, except that they have chosen to send their children to private sectarian schools. After Maine refused to fund their chosen sectarian institution, St. Dominic's Regional High School in Lewiston, Maine, the parents brought an action in the United States District Court for the District of Maine alleging numerous violations of their rights under: (1) the Establishment Clause; (2) the Equal Protection Clause; (3) the Free Exercise Clause; (4) the Due Process Clause of the Fourteenth Amendment; and (5) the Speech Clause of the First Amendment.[4]

---

1. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I.

2. *See* Me.Rev.Stat. Ann. tit. 20, § 5204(4).

3. *See* Me.Rev.Stat. Ann. tit 20–A, § 2951(2).

4. "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Establishment Clause, Free Exercise Clause, and the Free Speech Clause have been found to be applicable to the states through the Fourteenth Amendment. *See Everson v. Board of Educ.*, 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (citing *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105, 108, 63 S.Ct. 870, 87 L.Ed. 1292 (1943)).

The district court framed the issue before it as "whether Maine is constitutionally required to extend subsidies to sectarian schools." It viewed plaintiff-appellants' arguments "in terms of free exercise claims, establishment clause claims, equal protection claims and substantive due process claims," but found "it unnecessary to address [them] separately or to analyze the various tests that have been enumerated," because "[t]he same answer is obvious for all." Concluding that although plaintiff-appellants were free to send their children to sectarian schools, "they do not have a right to require taxpayers to subsidize that choice," the district court rejected their claims and granted summary judgment in favor of defendant-appellees. This appeal followed.

Below we address *seriatim* each of the bases on which the plaintiffs' claim an entitlement to relief.

## DISCUSSION

### I. Establishment Clause

■ First, plaintiff-appellants argue that the statute, § 2591(2), violates the Establishment Clause because, rather than treating religion neutrally, it demonstrates a hostility toward religion by excluding otherwise eligible sectarian schools from the tuition program based solely on the religious viewpoint presented by these schools.

Although "this Nation's history has not been one of entirely sanitized separation between Church and State," *Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 760, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1993), and while various forms of aid to religious institutions are permissible and have been approved by the somewhat inscrutable guidelines of the Supreme Court,[5] there is *no* binding au-

---

5. *See Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (upholding a federally funded program providing supplemental, remedial instruction to disadvantaged children on a neutral basis, taught on the premises of sectarian schools by government employees, thus reversing in part, *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985) and *School Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 105 S.Ct. 3248, 87 L.Ed.2d 267 (1985)); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (holding that a state university program, whereby payment is made from mandatory student fees to outside contractors for the printing cost of a variety of student organizations, does not contravene the Establishment Clause); *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) (holding that providing a deaf student with a government-paid sign language interpreter who accompanies the student to classes in a sectarian school does not violate the Establishment Clause); *Witters v. Washington Dept. of Services for the Blind*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (holding that the extension of aid to a blind student under a state vocational program by making direct payments to a student enrolled in a sectarian college does not violate the Establishment Clause); *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (holding that a state law allowing taxpayer-parents to deduct certain educational expenses in computing their state income tax does not violate the Establishment Clause even with regard to children attending sectarian schools); *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977) (holding that a state law: [1] authorizing the purchase and loan of secular text books to students in sectarian schools at their request or that of their parents; [2] supplying standardized test forms on secular subjects to sectarian schools that are thereafter scored by commercial services paid by the state; [3] providing speech, hearing, and psychological diagnostic services to students at sectarian schools at public expense by public employees; [4] authorizing the expenditure of public funds for therapeutic, guidance, and remedial services to students, including those in sectarian schools, the services to be provided at public locations, does not contravene the Establishment Clause, but provisions in that statute: [a] authorizing the expenditure of public funds for the purchase and loan to students or their parents of instructional material and equipment "incapable of diversion to religious use"—such as projectors, tape recorders, record players, maps and globes, science kits and weather forecasting charts—to be stored on sectarian school premises and administered therein by publicly hired personnel; and [b] providing field trip transportation and services to non-public school students, are invalid with regard to sectarian schools); *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29

thority for the proposition that the *direct* payment of tuition by the state to a private sectarian school is constitutionally permissible. *See id.* at 780, 93 S.Ct. 2955.

A statement to the effect that "Congress shall make no law respecting the establishment of religion," U.S. Const. amend. I, is hardly equivocal language. The fact that it is the first of the several constitutional do's and don'ts contained in the Bill of Rights may not have been coincidental. Separation of church and state constituted a paramount principle and goal in the minds of some of the most influential of the Framers both by dint of historical experience,[6] and personal conviction.[7]

■ We highlight the proposition that in some cases in which state infringement on the free exercise of religion takes place, otherwise prohibited conduct may be permitted if the state establishes an overriding societal interest. Upholding the Establishment Clause, which is aimed at avoiding an entangled church and state, is such a paramount interest. In the long run, an entanglement of the two has been shown by history to be oppressive of religious freedom. *See Nyquist,* 413 U.S. at 760, 93 S.Ct. 2955; *Engel v. Vitale,* 370 U.S. 421, 431, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (such a union may tend "to destroy government and to degrade religion."); *Everson,* 330 U.S. at 12, 67 S.Ct. 504 ("cruel persecutions were the inevitable result of government established religions."). The present case, in which *direct* subsidies would be paid by the state to a sectarian primary and secondary school, is such an imbroglio.

In *Nyquist,* New York created a two-part program to help defray the costs of

L.Ed.2d 790 (1971) (holding that a federal statute which provides grants to colleges and universities for the construction of buildings and facilities used exclusively for secular educational purposes may be applied to sectarian institutions without violating the Establishment Clause, but allowing the Federal government 20–year oversight authority over the use of any facility constructed with such funds to ensure its nonsectarian use, violates the Religion Clauses); *Board of Educ. of Cent. Sch. Dist. No. 1 v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (holding that the lending by a state to parochial school students of non-sectarian textbooks available to all students is permissible under the Establishment Clause); *Everson v. Board of Educ.,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (holding that a state may reimburse the parents of parochial school students for the cost of their transportation to and from the schools provided it is part of a "general program" whereby busing of students includes nonsectarian school students). *But see Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet,* 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (holding that the creation of a school district which *de facto* is defined by common religious affiliation, and delegation of the state's discretionary authority over public schools to said group, is a violation of the Establishment Clause); *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) (holding that certain public programs that provided services on sectarian school premises violated the Establishment Clause);

*Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) (holding that a state statute allowing the direct loan of: [1] instructional material, including periodicals, photographs, maps, charts, recordings, and films; and [2] equipment, including projectors, recorders, and laboratory paraphernalia, to sectarian schools violated the Establishment Clause); *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (holding that direct payments by a state to sectarian schools pursuant to a statute providing grants for maintenance and repair of school facilities as well as certain income tax deductions for tuition expenses at sectarian schools violate the Establishment Clause); *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (holding that the reimbursement by a state to sectarian schools of the cost of teachers' salaries, textbooks, or other instructional materials violates the Establishment Clause).

6. T. Curry, *The First Freedoms* 217 (1986) (stating that at the time of the framing of the Bill of Rights: "The belief that government assistance to religion ... violated religious liberty had a long history.").

7. *See* Thomas Jefferson, *A Bill for Establishing Religious Freedom, reprinted in* 5 *The Founder's Constitution* 84 (P. Kurland & R. Lerner eds., 1987); James Madison, *Memorial and Remonstrance Against Religious Assessments, cited in Everson,* 330 U.S. at 63–72, 67 S.Ct. 504.

educating low-income children who chose to attend private religious schools. *See* 413 U.S. at 762–67, 93 S.Ct. 2955. The first part of the program provided for direct money grants from the State to "qualifying" nonpublic schools to be used for the "maintenance and repair of . . . school facilities and equipment to ensure the health, welfare and safety of enrolled pupils." *Id.* at 762, 93 S.Ct. 2955. The second part involved tuition reimbursement grants which the state gave to low-income parents of private schoolchildren (including those who attended religious schools) as partial reimbursement for their children's tuition, and limited state income tax relief for parents who did not qualify for the tuition reimbursement. *See id.* at 764, 93 S.Ct. 2955. The Court concluded that all three programs were invalid under the Establishment Clause because they had the primary effect of advancing religion. *See id.* at 774–94, 93 S.Ct. 2955. With reference to the reimbursement portion of the law, the Court stated:

> There can be no question that these grants could not, consistently with the Establishment Clause, be given directly to sectarian schools, since they would suffer from the same deficiency that renders invalid the grants for maintenance and repairs. In the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideological purposes, *it is clear from our cases that direct aid in whatever form is invalid.*

*Id.* at 780, 91 S.Ct. 2091 (emphasis added).

This dichotomy between direct and indirect aid is a recurring theme throughout Establishment Clause litigation. Although not all cases fit neatly within this formula, and this somewhat tenuous distinction has been the subject of considerable criticism by academia,[8] it is the closest thing that we

have to a workable bright line rule, or that perhaps is possible.

Nevertheless, one thing is certain: the Supreme Court has never permitted broad sponsorship of religious schools. In those instances in which the Court has permitted funding to flow to religious schools, it has been in the context of a *targeted* grant, available to a *limited* population, for a *specific* purpose. *See, e.g., Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (upholding a federally funded program providing supplemental, remedial instruction to disadvantaged children on a neutral basis, taught on the premises of sectarian schools by government employees); *Zobrest v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) (holding that providing a deaf student with a government-paid sign language interpreter who accompanies the student to classes in a sectarian school does not violate the Establishment Clause). "The problem, like so many problems in constitutional law, is one of degree." *Meek,* 421 U.S. at 359, 95 S.Ct. 1753 (citation and internal quotation marks omitted). We find no authority in the Court's jurisprudence for now extending state support of sectarian schools from beyond the class of particular, limited situations described above. *See supra* note 5.

Moreover, reliance by plaintiff-appellants on the Supreme Court's decision in *Rosenberger v. Rector & Visitors of University of Virginia,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), is misplaced. In *Rosenberger,* the University of Virginia, a state instrumentality, authorized payment to outside contractors for the printing costs of a variety of publications issued by several student organizations. These payments, made from an activities fund generated by imposing mandatory student fees, were designed to support a broad

---

8. Mark J. Beutler, *Public Funding of Sectarian Education: Establishment and Free Exercise Clause Implications,* 2 Geo. Mason Independent L.Rev. 7, 40–46 (1993); Al McConnell, *Note, Abolishing Separate but*

*(Un)Equal Status for Religious Universities,* 77 Va. L.Rev. 1231, 1248 (1991); Evan T. Tagert, *Comment, The Supreme Court, Effect Inquiry, and Aid to Parochial Education,* 37 Stan. L.Rev. 219, 230–31 (1984).

range of extracurricular student activities related to the University's educational purpose. The University withheld authorization for payments to a printer with respect to one student organization's publication because it deemed it to be contrary to University guidelines prohibiting aid to religious organizations or activities. The student organization in question, as well as the publications for which printing costs were sought, promoted a "Christian" viewpoint. The University's denial of printing payments was successfully challenged by the student organization on the basis of viewpoint discrimination. *See id.* at 832–35, 115 S.Ct. 2510; *see also Regan v. Taxation with Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (holding that the state cannot discriminate based on the viewpoint of private persons whose speech it subsidizes).

In answering the University's concerns that such payments might run afoul of the First Amendment, the Court ruled that the funding did not contravene the Establishment Clause because it was "neutral towards religion." *Id.* at 840, 115 S.Ct. 2510. The neutrality of the program, the Court reasoned, distinguished it from a tax levied to *directly* support a church.[9] *See id.* There is a critical difference "between *government* speech [or action] endorsing religion, which the Establishment Clause forbids, and *private* speech [or action] endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Id.* at 843, 115 S.Ct. 2510 (emphasis in original, internal quotation marks omitted).

Most telling, from the perspective of the present case, is the majority's analysis of the issues presented by that appeal:

The Court of Appeals (and the dissent) are correct to extract from our decisions the principle that we have recognized special Establishment Clause dangers where the government makes *direct* money payments to sectarian institu-

tions. The error is not in identifying the principle, but in believing that it controls this case ... [T]he Court of Appeals decided a case that was, in essence, not before it, and the dissent would have us do the same. We do not confront a case where, *even under a neutral program that includes nonsectarian recipients,* the government is making *direct* money payments to an institution or group that is engaged in religious activity.... [T]he undisputed fact [is] that no public funds flow *directly* to [the student organization's] coffers.

*Id.* at 842, 115 S.Ct. 2510 (emphasis added, internal citations omitted).

In lauding neutrality as the keystone of Establishment Clause jurisprudence, plaintiff-appellants forget that neutrality is but one "hallmark of the Establishment Clause." *Rosenberger,* 515 U.S. at 846, 115 S.Ct. 2510 (O'Connor, J., concurring). *Rosenberger* neither trumpets the supremacy of the neutrality principle nor signals the demise of the funding prohibition in Establishment Clause jurisprudence. *See id.* at 852, 115 S.Ct. 2510 (O'Connor, J., concurring).

The historic barrier that has existed between church and state throughout the life of the Republic has up to the present acted as an insurmountable impediment to the *direct* payments or subsidies by the state to sectarian institutions, particularly in the context of primary and secondary schools. *See Tilton v. Richardson,* 403 U.S. at 684–87, 91 S.Ct. 2091 (relying on the lessened danger of prohibited entanglement when college level institutions are involved); *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973) (upholding the creation of a public agency designed to assist in the placement of revenue bonds for the construction of buildings designed for secular use at higher education facilities including parochial col-

---

9. "Our decision ... cannot be read as addressing an expenditure from a general tax fund...." *Id.* at 841, 115 S.Ct. 2510.

leges). Although the guidance provided by the Supreme Court has been less than crystalline, perhaps often by necessity due to the subject matter involved, approving *direct* payments of tuition by the state to sectarian schools represents a quantum leap that we are unwilling to take. Creating such a breach in the wall separating the State from secular establishments [10] is a task best left for the Supreme Court to undertake.[11]

Finally, we are at a loss to understand why plaintiff-appellants believe that the Establishment Clause gives them a basis for recovery. The Establishment Clause forbids the making of a law respecting the establishment of any religion. There is *no* relevant precedent for using its negative prohibition as a basis for extending the right of a religiously affiliated group to secure state subsidies.

## II. Equal Protection

■ Plaintiff-appellants argue that in addition to violating the Establishment Clause, Maine's alleged hostility towards religion violates their rights under the Equal Protection Clause of the Fourteenth Amendment. They claim that by virtue of the statute in question they are being discriminated against on the basis of religion, religious beliefs, speech content, and association.

Plaintiff-appellants' equal protection claims fail for many of the same reasons

that their Establishment Clause challenge founders. Writ simple, the state cannot be in the business of directly supporting religious schools. Plaintiff-appellants' equal protection claims fail, because, regardless of the appropriate level of scrutiny we employ, the state's compelling interest in avoiding an Establishment Clause violation requires that the statute exclude sectarian schools from the tuition program.[12]

Plaintiff-appellants allege on appeal that they "have been singled out simply because they desire their children to be educated in a Christian environment and from a biblical perspective, and for no other reason." Appellants' Br. at 23–24. Plaintiff-appellants desire that the state pay grants directly to sectarian schools, in this case St. Dominic's, to subsidize their children's schooling. Given the present state of jurisprudence, we can see no way in which this can be done without violating the Establishment Clause. *See Nyquist,* 413 U.S. at 780, 93 S.Ct. 2955. As a result, we find no Equal Protection Clause violation.

We are fortified in our conclusion by the Maine Supreme Court's recent opinion in *Bagley v. Raymond School Department,* 728 A.2d 127 (Me.1999), dealing with a similar situation. In resolving a similar Equal Protection Clause challenge, the court stated:

That state funds would flow directly into the coffers of religious schools in Maine were it not for the existing exclusion

**10.** "The First Amendment has erected a wall between church and state. That wall must be kept high and impregnable. We could not approve the slightest breach." *Everson,* 330 U.S. at 18, 67 S.Ct. 504. Nevertheless, the Court upheld the reimbursement to parents from public funds for the cost of fares paid by them for public transportation by public carriers of children attending public and Catholic schools. *See id.*

**11.** "We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that if a precedent of this Court has direct application in a case, yet appears to rest on reasons

rejected in some other line of decision, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini,* 521 U.S. at 238, 117 S.Ct. 1997 (citation and internal quotation marks omitted).

**12.** Unlike our concurring brother, we find it necessary to decide the Establishment Clause issue because we agree with the Maine Supreme Court that "If the State's justification [had been] based on an erroneous understanding of the Establishment Clause, its justification w[ould] not [have] withst[oo]d any level of scrutiny." *Bagley v. Raymond School Dep't,* 728 A.2d 127 (Me.1999).

cannot be debated. If the religious school exclusion were eliminated, the State would likely pay more than $5,000 per student to Cheverus High School, without restriction on the use of those funds. In the entire history of the Supreme Court's struggle to interpret the Establishment Clause it has never concluded that such a direct, unrestricted financial subsidy to a religious school could escape the strictures of the Establishment Clause. While it may be possible for the legislature to craft a program that would allow parents greater flexibility in choosing private schools for their children, the current program could not be easily tailored to include religious schools without addressing significant problems of entanglement or the advancement of religion.

*Bagley*, 728 A.2d at 147.

### III. Free Exercise

█ Plaintiff-appellants argue that § 2951(2) violates the Free Exercise Clause of the First Amendment because it excludes funding of sectarian education solely on the basis of religion. However, we conclude that the Free Exercise Clause is not implicated here. *See Sherbert v. Verner*, 374 U.S. 398, 412, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (Douglas, J., concurring) ("[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.").

Four points support our conclusion. First, at least some of the parents in this litigation eschew *any* religious motivation for wishing to attend St. Dominic's. For them, academic superiority, rather than the school's Roman Catholic affiliation, drives their enrollment decisions.

Second, no one plausibly reading the statute could come to any conclusion other than that § 2591(2) does not prevent attendance at a religious school. Nor does § 2591(2) prevent religious education of children in Maine. All it means is that the

cost of religious education must be borne by the parents and not the state.

Third, *Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989), identifies the free exercise inquiry as asking "whether government has placed a substantial burden on the observation of a *central belief or practice*." (emphasis added). Factually speaking, education at a parochial school is not such a belief, for the Roman Catholic Church does not mandate it. *See Catechism of the Catholic Church* 537–38 (1994) (stating that parents' responsibilities for religious education for religious education takes place primarily in the home and that choosing a religious school is a right but not an absolute duty). To be sure, the Catholic Church requires some religious education, *see id.* at 538, but as stated above, § 2591(2) does not prevent such religious education. Indeed, it says nothing about it. Moreover, no parent makes the claim that attendance at a religious school is a central tenet or practice of their faith.

Fourth, the primary case cited by the parents, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), is inapposite. In that case, the record showed a substantial animus against Santería that motivated the law in question. *See id.* at 543, 113 S.Ct. 2217 (stating that the "record in this case compels the conclusion that suppression of the central element of the Santeria worship service was the object of the ordinances."). No such showing has been made here.

As we mentioned earlier, even if this were a limit on free exercise, the state has justified the limit by its purpose of avoiding violation of the Establishment Clause.

### IV. Due Process and Speech Clause Claims

Plaintiff-appellants argue that § 2951(2) violates the Due Process Clause of the Fourteenth Amendment and the Speech

**66**

Clause of the First Amendment by preventing appellants from using their tuition allotments to expose their children to the educational message which best reflects their morals and values.

■ First, the parents argue that they have a fundamental right to direct the upbringing and education of their children based on substantive due process rights that arise from Supreme Court decisions. *See, e.g., Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). On that general proposition, we do not disagree. However, that fundamental right does not require the state to directly pay for a sectarian education. Here, the statute does not prevent the parents from doing what they wish; it only prevents the state from helping pay for their wishes. We reject this contention out of hand.

■ Second, on the free speech side, plaintiff-appellants contend that § 2591(2) violates their rights because it denies parents the right to communicate and instruct their children in the areas of religion, morals and ethics which they cannot accomplish in non-sectarian schools. With little more than academic articles to bolster their view, we find this claim to be meritless as well.

## CONCLUSION

The judgment of the district court is *affirmed.* Costs are imposed against appellants.

LEVIN H. CAMPBELL, Senior Circuit Judge, concurring.

I agree that plaintiffs have not shown that Maine's statute subsidizing attendance at non-sectarian private schools, in communities lacking public schools, is unconstitutional. But I see no need for this court to decide that a broader statute (i.e.,

one also subsidizing attendance at sectarian private schools) would violate the establishment clause of the First Amendment ("Congress shall make no law respecting an establishment of religion").

For the reasons stated by my colleagues, *supra,* I agree that the Maine statute, as presently written, does not violate the free exercise clause of the First Amendment nor principles of substantive due process.

My colleagues and I part company, however, in our analysis of plaintiffs' establishment clause and equal protection clause claims. The Maine tuition statute was narrowed in 1981 to exclude religiously-affiliated schools in response to a decision of the Maine Attorney General concluding that the inclusion of religiously-affiliated schools in Maine's tuition program violated the establishment clause of the federal Constitution. *See Bagley, et al. v. Raymond School Department,* 728 A.2d 127 (Me.1999). Last month, the Maine Supreme Judicial Court upheld the continued constitutionality of the exclusion of sectarian schools, holding that to fund them would violate the establishment clause. My colleagues apparently believe, as did the Maine court, that since the Maine legislature excluded sectarian schools because *of establishment clause concerns, the latter* must be addressed by us: the Maine court, indeed, suggested that if allowing tuition benefits to the sectarian schools would *not* violate the establishment clause, then denying such benefits would violate the equal protection clause, as denial would not then withstand even the minimal, "rational basis," scrutiny under the Constitution's equal protection clause.[13] In such event, plaintiffs would have succeeded in demonstrating that the current statute is unconstitutional, being violative of the equal protection clause.

**13.** The Maine Supreme Judicial Court actually believed that strict scrutiny was called for, religion being a fundamental right, but that even under a rational basis standard the exclusion of religious schools would violate

equal protection (assuming no establishment clause bar) because of the irrationality of denying them tuition benefits if the legislature's sole apparent reason for denial was legally incorrect.

While I understand the above rationale, I think it goes further than necessary. I prefer not to render an opinion based on speculation as to the constitutionality of a statute different from the one under discussion. Contrary to what my colleagues seem to suggest, *supra*, ours is not a case that involves the "imbroglio" of direct subsidies paid to sectarian schools. Rather, the Maine legislature, acting on the basis of an opinion issued by its Attorney General, has expressly *excluded* sectarian schools from the possibility of receiving subsidies. The question is whether the current statute is unconstitutional, not whether a more inclusive one would be.

Plaintiffs argue that various constitutional provisions, including, oddly, the establishment clause itself, are offended by denying tuition benefits to sectarian schools. But none of plaintiffs' theories of unconstitutionality work. The establishment clause certainly provides plaintiffs with no affirmative basis for requiring the funding of sectarian schools, for reasons well explained by the Maine Supreme Judicial Court in its recent decision, 728 A.2d at 134–35, and by my colleagues.

Because plaintiffs' attempt to use the establishment clause as a sword fails, and because the Maine statute does not, for the reasons stated by my colleagues, violate the free exercise clause, no fundamental right is implicated here for equal protection purposes. Thus, the proper level of scrutiny under the equal protection clause is the most deferential—rational basis review. *See Johnson v. Robison*, 415 U.S. 361, 375 n. 14, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) (where Act did not violate appellee's right of free exercise of religion, court has no occasion to apply a standard of scrutiny stricter than rational basis test); *see also Griffin High School v. Illinois High School Ass'n*, 822 F.2d 671, 674 (7th Cir.1987).

In my view, plaintiffs' equal protection clause claim fails not because, as my colleagues conclude, the Maine Attorney General's opinion relied upon by the legislature was necessarily *correct* that including sectarian schools would or might violate the establishment clause, hence was better left alone. Rather, the action of the Maine legislature need only be supported by a *rational* basis, not one that turns out to be correct on the merits. Rational basis review is "a paradigm of judicial restraint" ... and "[w]here there are 'plausible reasons' for [the action of the legislature], 'our inquiry is at an end.'" *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)(quoting *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980)). *See also Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 672, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) ("the Equal Protection Clause is satisfied if we conclude that the California Legislature *rationally could have believed*" that the measure promoted its objectives) (emphasis in original).

The Maine legislature rationally could have believed that including sectarian schools within its funding scheme would or might violate the establishment clause, hence was better left alone. Several opinions of the United States Supreme Court cited by my colleagues and by the Maine Supreme Judicial Court undoubtedly lend support to such a viewpoint. *See, e.g., Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). These precedents are not conclusive, however, and many commentators interpret the more recent cases as indicating that the Supreme Court will uphold state tuition schemes that provide funding to sectarian as well as non-sectarian schools. The fact is that establishment clause jurisprudence as applied to this particular area is so unclear today that no court other than the Supreme Court can reliably resolve whether a statutory scheme like Maine's would violate the establishment clause were it to fund sectarian as well as non-sectarian schools. In spite of this uncertainty, how-

ever, the Maine legislature's fear, based on its Attorney General's analysis, that including sectarian schools would violate the establishment clause was and remains entirely rational. While the odds were perhaps stronger in 1981 than they are today, existing case law still provides a reasonable basis for legislative refusal to extend tuition grants to sectarian schools. I see the Maine legislature, in 1981 and to this moment, as having rationally and prudently excluded sectarian schools because of a well-founded concern—whether or not ultimately correct—that to do otherwise will or may violate the establishment clause. The existence of that fear is rational enough, I think, to meet equal protection (and free exercise) requirements, however defined.

This is not to say that the Supreme Court may not someday decide that inclusion of sectarian schools in a scheme like this is permissible under the establishment clause. A strong argument can be made to that effect. Were the Supreme Court to so rule, plaintiffs might then be in a position to seek relief on free exercise or equal protection grounds, for under those circumstances the legislative basis for the exclusion of sectarian schools—the fear that the establishment clause bars their inclusion—will have been negated. But in today's climate, lacking further Supreme Court enlightenment, plaintiffs cannot demonstrate that the Maine statute violates any provision of the Constitution. Accordingly, I agree that we should affirm the judgment of the district court, but— like that court—I see no need whatever to reach out and decide the thorny establishment clause issue—an issue that, as my colleagues also recognize, can be meaningfully resolved only by the Supreme Court itself.